Argued March 13; affirmed September 23, 1930

# QUILLEN *v.* SCHIMPF ET UX.

(291 P. 1009)

*Wm. L. Cooper* and *Robert F. Maguire,* both of Portland (Wm. L. Cooper and Winter & Maguire, all of Portland, on the brief) for appellants.

*Louis E. Schmitt* and *Norman S. Richards,* both of Portland (Richards & Richards and Louis E. Schmitt, all of Portland, on the brief) for respondent.

584

BROWN, J. ■ The defendants assert that the plaintiff abandoned his possession of the real property involved herein. There is some evidence tending to show that the plaintiff had ceased to reside in the dwelling house situate upon the premises. However, to reach the verdict rendered, the jury must have found, and the record abundantly shows, that the premises were never abandoned by the plaintiff. While the plaintiff was in the state of Washington where he had gone for the purpose of earning support for his children and reducing his indebtedness to the defendants on account of the contract of sale and purchase of the house and lot, the plaintiff's wife, with her three children, at a time when they were all suffering from severe colds, went to the home of the plaintiff's mother-in-law with the intention of remaining there during their illness. During all of the time of the absence of the plaintiff and his family from the premises, and up to the time of the commission of the alleged trespass herein, there remained in the house a piano, a davenport,

rugs, household effects, clothing and other articles. "Abandon" is defined by Webster's New International Dictionary thus:

"To relinquish or give up with the intent of never again resuming or claiming one's rights or interests in; to give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in."

Neither by act nor intent did the plaintiff abandon his residence on lot 12, block 1, Trent addition to Portland.

■ The plaintiff prosecutes this action upon the theory that he is in the lawful possession of the premises upon which the alleged trespass was committed. On the other hand, the defendants contend that the plaintiff had no right of possession under the contract of sale and purchase. Under the facts in this case, we cannot follow counsel for defendants. It was early decided in Oregon that a mere agreement to sell real property does not constitute a license to the purchaser to enter: *Lee v. Summers,* 2 Or. 260. In *Burkhart v. Howard,* 14 Or. 39 (12 P. 79), it was held that the effect of a bond for a deed is to transfer the equitable title in the land to the vendee, and that the vendor holds the legal title merely as security for the sum named therein. See, also, *Sayre v. Mohney,* 30 Or. 238 (47 P. 197). For the legal effect of the entering into possession by a purchaser of of property intended to be conveyed under an executory agreement, see *Sievers v. Brown,* 36 Or. 218 (56 P. 170). The following excerpt from the teachings of an eminent law-writer is peculiarly applicable to the situation here presented:

"The legal effect of a title bond or agreement for a deed is sometimes said to be like a deed by the vendor

and a mortgage back by the vendee. There can be no sensible distinction between the case of a legal title conveyed to secure the payment of a debt and a legal title retained to secure the payment. \* \* \* .

"A vendee has no right of possession before he obtains a deed unless the contract so specifies or the vendor voluntarily lets him into possession. \* \* \* Upon the giving of a bond for a deed, providing only for the payment of stipulated sums, the obligee is entitled to possession, and after he has taken possession the obligor can not oust him until his equitable estate has been divested by foreclosure, and can not until then maintain an action to quiet title against the obligee." 5 Thompson on Real Property, §§ 4290, 4292.

For a valuable note see annotation, 28 A. L. R., p. 1069.

While the defendants in this case claim that no right of possession of the property is given by the terms of the contract, they concede that they permitted the plaintiff to enter into possession thereof, which possession was continuous until the removal of the household goods and furniture by order of the defendants. Defendants say in their brief:

"The defendant permitted the plaintiff to enter into possession, which continued, as plaintiff claims, until February 9, 1928, and, as the defendant claims, until February 4th or 5th."

Moreover, the case was tried below upon the theory that the plaintiff was in possession of the property.

■ Now addressing ourselves to the subject of trespass: Under the facts disclosed by the record, can the plaintiff herein successfully maintain an action for trespass?

In 24 Standard Encyclopedia of Procedure, at pages 925 and 926, there appears the following succinct statement which may be helpful to our consideration of this question:

"The action of trespass is a personal, as well as a civil action, in form *ex delicto,* in which damages alone are sought. It is distinct from the actions of trover, replevin, trespass on the case, forcible entry and detainer, ejectment, and waste, and from real actions generally."

With reference to the sufficiency of the plaintiff's interest to sustain the action of trespass, we note the following:

"Since the gist of an action of trespass for injury to real or personal property is the disturbance of possession, the action can be maintained only by the person who was in possession of the premises or property, either actually or constructively, at the time of the trespass.

\* \* \* \* \*

"If \* \* \* the plaintiff has a special property in the thing which is the subject of the trespass, and a right to possession, he may maintain an action of trespass, even against the general owner, general property in such case being no excuse or justification for a trespass": 24 Stand. Ency. of Proced., pp. 929, 930.

On the same subject, it is written at section 1009, 4 Sutherland on Damages (4th Ed.), that:

"The gist of this action (of trespass) is the injury to the plaintiff's possession; only the party actually or constructively in possession at the time the trespass was committed can sue. \* \* \* Possession at the time the trespass was committed is all that is necessary to give a right of action. It need not continue until suit is brought."

This eminent authority defines trespass on real property thus:

"Every unauthorized intrusion into the land of another is sufficient trespass to support an action for breaking the close. It is immaterial to the cause of action that no actual injury is done, or that the tortious act of the defendant is even beneficial to the plaintiff. * * * When the plaintiff's land is illegally entered, a cause of action at once arises; whatever is done after the breaking and entry is but an aggravation of damages": 4 Sutherland on Damages (4th Ed.), § 1010.

This doctrine is also enunciated in 28 A. & E. Ency. of Law (2d Ed.), at page 579, where the editor teaches that a written contract of purchase will with possession, empower the vendee to maintain an action of trespass.

From the foregoing it follows that if the plaintiff in the instant case had the lawful possession of the dwelling house involved, it was trespass upon the part of the defendants to break into and enter the house. 28 A. & E. Ency. of Law (2d Ed.), p. 582, and authorities under note 10. As to what constitutes "breaking open," the same authority says, at page 583:

"Even opening the door of a dwelling house which is only latched is trespass."

The important question presented by this appeal relates to the right of plaintiff to recover for humiliation, mental pain and anguish, apart from other damages.

■ In the case at bar, accepting the findings of the jury, the facts establish that the plaintiff was in lawful possession of the dwelling house hereinbefore described, which house was occupied by himself, his wife and three children, and was completely furnished. The plaintiff was a day laborer. Through lack of employment he was unable to meet his monthly payments on

the contract above set out, and he claims that defendants assented to his making the payments at some later period, when he could secure work. Finally, being unable to get work at home, he went to the state of Washington for the purpose of earning money with which to support his family and meet the instalments on his contract. The trip to Washington in search of labor was made with the acquiescence of the defendants, they saying that it would be all right with them for him to "make up" the payments when he found work. Shortly after the departure of plaintiff, however, the defendants concluded that the deferred payments should be made, or, in lieu of such payment, that they would take possession of the property. From the bill of exceptions we learn that, on February 9, 1928, defendant Fred Schimpf went to the home of plaintiff's mother-in-law where plaintiff's wife was temporarily staying with her three sick children, and as to what took place while he was there the record shows:

"He said, 'Have you got any money?' The witness said, 'No, I haven't got no money; I wouldn't have street-car fare.' Defendant said, 'That is funny.' The witness said, 'My husband went to work, and if one of the kiddies got sick I wouldn't have no money and I wouldn't know where to get him because he went to work.' The defendant said, 'That is funny. Your furniture is down there and you are up here.' The witness then said, 'Well, I have a bad cold.' The defendant then said, 'Well, I will give you an hour and a half to get your husband or I will move you out. I can move you out for $15.00.' The witness then replied, 'You can't do that.' The defendant then said, 'I will talk to my lawyer.' Defendant then turned and walked away."

When the defendant left, the plaintiff's wife went to the dwelling house and remained there for a number

of hours, but the defendant did not appear. On the following Sunday she sent her sister down for some clothing for the children and some fruit for their Sunday dinner, and the sister then discovered that all of the furniture and belongings had been moved from the house and defendant's son-in-law was residing therein. Plaintiff's wife immediately telegraphed him at Bellingham and he returned to Portland. The testimony shows that the defendants, or someone acting for them, had opened the outer door of the dwelling with a pass key, entered and removed all the furniture, household goods and clothing, loaded it onto a moving van and stored it, thus placing this workman and his wife, with their three children, in the city of Portland without a home, and without a stitch of clothing other than that upon their backs, at a time when work was extremely difficult to find and thousands were seeking employment.

A leading case on the subject of recovery of damages arising out of mental suffering is *Gadbury v. Bleitz,* 133 Wash. 134 (223 P. 299, 44 A. L. R. 425). This was an appeal by plaintiff from a judgment of the superior court for King county, Washington, in favor of defendant, in an action brought to recover damages for personal injuries averred to have been caused by defendant's breach of a contract for the cremation of plaintiff's son. In discussing the case the court referred to its prior holdings to the effect that damages are not recoverable for mental suffering unaccompanied by physical violence, occasioned by the negligence of another. After citing a number of cases, the court, continuing, said:

"However, we have adopted the rule that if such suffering is the direct result of a willful wrong as dis-

tinguished from one that is merely negligent, then there may be a recovery: *Wright v. Beardsley,* 46 Wash. 16 (89 P. 172). This is a well-established exception recognized by modern text-writers. 17 C. J., 831, lays down the rule as follows:

" 'The general rule, supported by the weight of authority, is that mental pain and suffering will not alone constitute a sufficient basis for the recovery of substantial damages. Certain exceptions to this rule are recognized in actions for breach of contract of marriage and certain cases of wilful wrong, especially those affecting the liberty of personal security, character or reputation, or domestic relations  *  *  *  as the ordinary, natural and proximate consequence of the wrong complained of.'

"8 R. C. L., 531, states it in this manner: 'In case of willful or wanton wrongs and those committed with malice and an intention to cause mental distress damages are, as a general rule, recoverable for mental suffering, even without bodily injury, and though no pecuniary damage is alleged or proved. And in general, damages for mental anguish or suffering are recoverable where the act complained of was done with such gross carelessness or recklessness as to show an utter indifference to the consequences when they must have been in the actor's mind.'

"It is unnecessary to state all the reasons for the rule, or to attempt to draw a distinction between the many cases cited in the briefs, for an examination of them will show that in nearly every one where recovery was denied it has been upon the ground that the act of the defendant was simply negligent, and was not an act done with the willful intent to cause the plaintiff to suffer."

In that case it was held that damages may be recovered for mental suffering which is the direct result of wilful wrong as distinguished from mere negligence, although there is no physical violence. In accordance with that holding, the judgment was reversed and the trial court directed to grant a new trial.

Another leading case, and one lending strong support to the doctrine that mental suffering and humiliation due to an actionable wrong are proper elements of damages although unaccompanied by physical injuries, is *Sager v. Sisters of Mercy*, 81 Colo. 498 (256 P. 8, 56 A. L. R. 655). The averments essential to an understanding of that case are that defendants employed plaintiff as a cook at the Montcalm sanatorium for a definite period, for which services she was to receive a specified salary, with board and lodging while thus employed, the place of lodging being a cottage near the sanatorium; that she was given the exclusive right to the possession of the cottage during her employment; that she performed her duties to and including July 22, 1926, on which date defendants discharged her notwithstanding she had been hired for a longer period of time; that she accepted a check for services rendered and went to the bank to cash it; that, while she was gone, defendants wantonly, rudely, and in disregard of her rights and feelings, broke into the cottage and without her consent removed all of her clothing and other property, including two receptacles for papers which contained $50 in cash; that they destroyed and burned her papers, including the money; that they secured the town marshal and demanded possession of the cottage while she was lawfully occupying it, all of which she alleged ''caused this plaintiff great anguish and suffering of mind, great wounding of pride, and great humiliation as to her social position among her friends and acquaintances, to plaintiff's damage in the sum of $950.'' She complains that such acts were ''attended by circumstances of insult and wanton and reckless disregard of plaintiff's rights and feeling.'' She demanded $500 as exemplary damages, as well as actual damages.

As is usual, it was argued in that case that recovery cannot be had for mental suffering and humiliation except when accompanied by some physical injury to the person. Answering this argument, the court said:

"Such, no doubt, is the rule in some jurisdictions, but not in ours. We held otherwise in *Westesen v. Olathe State Bank*, 78 Colo. 217 (44 A. L. R. 1484, 240 P. 689), not cited in the briefs. We said there, quoting from 17 C. J. 828:

" 'Mental pain and suffering in connection with a wrong which apart from such pain and suffering constitutes a cause of action is a proper element of damages where it is the natural and proximate consequence of the wrong.' "

Continuing, the court said the case under consideration was not a case based upon contract, but upon tort, and that the rule quoted from 17 C. J. above had frequently been applied to cases sounding in tort.

In *Brents v. Morgan*, 221 Ky. 765 (299 S. W. 967, 55 A. L. R. 964), it was held that substantial damages may be allowed for invasion of the right of privacy, although the result is only mental anguish and cannot be measured by a pecuniary standing.

In *Magee v. Holland*, 27 N. J. Law 86 (72 Am. Dec. 341), the court adjudged that a father whose children had been wrongfully taken away from him was entitled to compensation for the injury done to his feelings as a father by losing his children.

In *Montgomery v. Crum*, 199 Ind. 660 (161 N. E. 251), it was held that the mental suffering of a parent was a proper matter for consideration in determining the damages in an action for wrongful abduction of a child.

In *Lyons v. Smith*, 176 Ark. 728 (3 S. W. (2d) 982), it was held that the rule that mental anguish or mental suffering cannot be made the basis of an action in the absence of physical injury accompanying the same has no application in the case of a wilful and wanton trespass upon land, preventing the owner by intimidation and threats from putting her land into cultivation, causing a substantial pecuniary damage.

An interesting case is *Westesen v. Olathe State Bank*, 78 Colo. 217 (240 P. 689, 44 A. L. R. 1484). That case was an action for damages for the breach of a contract whereby the defendant, a banking corporation, agreed to lend plaintiff money for a journey to California by crediting his account with such sums as he might need after reaching his destination. The case had twice previously been before the Supreme Court of Colorado. At the third trial the court permitted the jury to assess damages resulting from humiliation and mental suffering alleged to have been caused by defendant's breach of the contract, in addition to other damages caused by the breach. The jury returned a verdict for the plaintiff, assessing damages for loss of expenses in the sum of $700, and, for humiliation and mental suffering, $1,000. The defendant filed a motion for a new trial, alleging, chiefly, that it was error to allow damages for humiliation and mental suffering, whereupon the trial court set aside the verdict as to the item of $1,000 for humiliation and mental suffering, and judgment was entered upon the $700 item thereof. The plaintiff, for the third time, took his case to the supreme court for review. In the opinion rendered by the court, there appears the following expression:

"The principal question presented by the record, upon this review, is: Can damages for humiliation and mental suffering be allowed in this case?"

In its recital of the facts, the court said, among other things:

"The defendant bank was informed of the purpose of the loan, and knew that plaintiff intended to use the money for a trip to California. Before he left for California, plaintiff left with defendant bank five promissory notes of $1,000 each, and defendant promised and agreed that plaintiff should have a credit of $5,000 with the bank, against which plaintiff could check at his convenience. After plaintiff reached California, defendant refused to honor plaintiff's checks. It is true that ordinarily no recovery can be had for mental suffering and humiliation arising out of a breach of contract by a bank to honor a check, because mental suffering and humiliation are not the natural result of a mere protest or dishonor of a check, or such a result as is reasonably anticipated [citing authorities]. In the instant case, the breach was the proximate cause of the mental suffering and humiliation, for it resulted in more than the mere dishonor of a check. The breach deprived the plaintiff of funds after he got to California, where defendant knew he was going, having borrowed the money or made the agreement solely in order to be able to make the trip. In California, plaintiff was away from home and among strangers. The defendant's breach of the contract left him without financial resources or credit. Under such circumstances, to cause his check to be worthless would naturally result in humiliation and mental suffering. In the instant case, humliation and mental suffering was properly an item of damage."

For further discussion of the right to recover for mental pain and anguish alone, apart from other damages, see extensive note found in 23 A. L. R., 361, and particularly in cases of trespass see page 390 of that work. For annotations supplementary to those contained in 23 A. L. R. 361, see 44 A. L. R., 428, note, and 56 A. L. R., 657.

The defendants moved for an involuntary nonsuit upon the ground that plaintiff had breached the contract and was in default, and that there was no waiver of the default; "that the plaintiff's right of action, if any, is not by way of trespass upon real property, but by way of an action at law for the return of moneys on the contract; that it affirmatively appears from the evidence that the plaintiff, upon the entry of the premises by the defendant, treated the contract as a rescinded contract." We have already said, in effect, that if the plaintiff was in lawful possession of the premises at the time the defendants "broke" the outer door of the dwelling he could successfully maintain this action. The jury found that lawful possession of the premises rested in plaintiff on that date. Moreover, the record shows that in the beginning the contract was treated by the parties thereto as one of the many modern, popular instalment sales contracts which provide for a small "down payment," the balance to be paid in monthly instalments running through the years while the purchaser enjoys the possession of the property.

In the instant case the trial jury was instructed with much care. The rights of the defendants were safeguarded. The meaning of "waiver," "notice," and "breach of contract" was explained, and the terms "wantonly" and "maliciously" were correctly defined. The right of the plaintiff to recover compensatory damages and "smart money" was likewise explained. After a careful consideration of all alleged errors, we are unable to say that reversible error was committed by erroneous rulings made by the court. As to the weight of the evidence upon the question of the defendants' waiver of the strict provisions of the contract, the writer may possess some doubt. If required, or

permitted, to pass upon the weight of such evidence, his conclusion might, perchance, be at variance with that of the jury. But, in considering a motion for nonsuit or for a directed verdict, this court is bound to accept the plaintiff's evidence as true. See collection of local citations in *Farrin v. State Industrial Accident Commission,* 104 Or. 452 (205 P. 984). In adherence to this rule, motions for nonsuit and directed verdict have long been treated as demurrers to the evidence.

In the case of *Feay v. Decamp,* 15 Serg. & R. (Pa.) 228, the court states that a demurrer to evidence is a "dangerous experiment." The opinion continues thus:

" 'He who demurs to parol evidence (says Chief Justice Tilghman) engages in an uphill business; for every fact is taken *pro confesso,* which the jury might, with the least degree of propriety, infer from the evidence. The court is not nicely to weigh the evidence, and decide according to the turn of the balance; if that were the law, the trial by jury would be destroyed. It never was intended that, by a demurrer to evidence, the court should become triers of the facts. * * *.' [*Mather v. Ministers of Trinity Church*] 3 Serg. & R. (Pa.) 516 [8 Am. Dec. 663]."

In their zeal to preserve the trial by jury inviolate, the people of the state of Oregon enacted the following provision of the fundamental law:

"The right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict." Or. Const., Art. VII, § 3c.

That language is clear, plain, concise, and means just what it says.

This case should be affirmed. It is so ordered.

Coshow, C. J., and Bean and Belt, JJ., concur.