REYNOLDS METALS COMPANY, a corporation, and Henry W. Shoemaker, Appellants,

v.

I. B. WAND and Alice R. Wand, Appellees.

No. 17488.

United States Court of Appeals Ninth Circuit.

Aug. 1, 1962.

King, Miller, Anderson, Nash & Yerke, and Fredric A. Yerke, Jr., Portland, Or., Gustav B. Margraf, and W. Tobin Lennon, Richmond, Va., for appellant.

Koerner, Young, McColloch & Dezendorf, and Herbert H. Anderson, Portland, Or., for appellee.

Before POPE, KOELSCH and DUNIWAY, Circuit Judges.

POPE, Circuit Judge.

The appellees-plaintiffs filed a complaint against the appellants in the Circuit Court of the State of Oregon describing the complaint as one for "damages for trespass and nuisance". Thereafter the cause was removed on the petition of appellants-defendants to the above named District Court of the United States.

The complaint alleged that during the period beginning May 1, 1957, and continuing until the commencement of the action, which was on July 13, 1959, the defendants, in the operation of a certain manufacturing establishment near Troutdale, Oregon, invaded the plaintiffs' property, consisting of approximately 16 acres upon which they had been engaged in raising lilies, bulbs and flowers, and deposited thereon various noxious and dangerous gases, fumes and particulates; that this invasion rendered plaintiffs' property unfit for the growing of such products and deprived them of the use and enjoyment of their property; that they had been prevented from engaging in the bulb growing business, and in consequence for the injuries claimed they sought compensatory damages of $30,-000, and $500,000 as punitive and exemplary damages.[1]

The defendants' answer pleaded, among other things, the execution on July 18, 1957, by I. B. Wand and others, of a written release which for a stated consideration of $7500, released the defendant Reynolds Metals Company, its officers, agents and employees from all liability to plaintiff I. B. Wand, and the other persons named, or any of them, "as to claims and demands arising out of the location, existence or operation of said Troutdale aluminum reduction plant and at any time up to and including the day of said release for injury or damages to person or property, both real and personal owned or claimed" by the said persons executing the release or any of them, "as owner, possessor, tenant or lessee, of

---

1. In the pretrial order it is recited that plaintiffs claimed damages of $32,000 for having been "prevented from engaging in the bulb growing business", and $15,-000 because they were "deprived of the use and enjoyment of their property."

whatsoever nature, whether known or unknown." The execution of the release was asserted as a complete defense to the action.

Subsequently a pretrial order was settled in which certain facts were agreed upon, and the contentions of the parties stated, and in which it was stipulated that: "Trial of this action will be expedited if the issue relating to the legal effect of the release identified as Exhibit 124 is adjudicated by the court separately and prior to the trial of the other issues involved in this action."

The court proceeded to a trial of the segregated issue thus referred to and thereafter made findings of facts and conclusions, and entered an order to the effect that such release "does not bar plaintiffs' action herein." In an accompanying opinion the court found that the order thus made "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." Thereupon, this court, as provided in Title 28 U.S.C. § 1292(b), made an order granting the application of the appellants for permission to appeal.

■ The appeal was argued and submitted to us. After consideration of the record we have come to the conclusion that the trial court did not have before it sufficient evidence to permit it to reach a conclusion as to whether the release referred to did or did not bar any part of the plaintiffs' claim or claims, and that the interlocutory judgment must be reversed and set aside. In our view it is doubtful if the question as to the effect of the release can be determined short of a full trial of the case upon its merits.

It appears from the stipulations in the pretrial order that the defendant Reynolds Metals Company commenced operations at its Troutdale, Oregon, aluminum plant about September 23, 1946; that plant has been operated since that time. In its operation gases, fumes and particulates were created and carried from the plant and diffused in the air and portions thereof settled upon some of the plaintiffs' lands and the vegetation thereon. When the plant was first operated the defendant Reynolds had installed certain devices for precipitating a portion of the gases, fumes and particulates and thus minimizing the quantities escaping in the air. This cost approximately $271,846. About June 1, 1949, Reynolds commenced the installation of a different and improved device for minimizing the escape of gases, fumes and particulates. This new system cost $2,-139,185; but it did not prevent all such gases, fumes and particulates from escaping. There is nothing in the record to show that any further lessening of the escape of such matters is possible.

Prior to 1946, plaintiff I. B. Wand, with two of his partners, were engaged in the commercial growing of bulbs on the land owned or occupied by them. They continued such operations as a partnership until 1953 when one of the partners, who were brothers, left the business and the other two, including I. B. Wand, continued for a year. The third partner quit in 1954. In 1955 and 1956, I. B. Wand, individually, continued to engage in the business. In 1956, I. B. Wand, himself, quit the business. At some time after 1951, I. B. Wand and his two said partners, claimed that such gases, fumes and particulates from the plant had caused injury and damage to the produce of lands used by them. On July 18, 1957, the said I. B. Wand and the other two persons mentioned executed the release previously described. The defendant Shoemaker was manager of the aluminum reduction plant during the period subsequent to May, 1, 1957.

The court's findings include the following paragraphs: "II. Plaintiffs' claim in this case is for alleged injury and damage based upon conduct of defendants occurring subsequent to the date of said release. III. At the time said release was executed there was no damage to plaintiffs certain to result in the future from defendant's actions."

We are unable to find anything in the record to support or warrant either of

these findings. The only evidence contained in the record consists of a deposition of I. B. Wand, (evidently a discovery deposition), taken by defendants on November 6, 1959, and three other depositions of I. B. Wand, (referred to in one of them as Ignatius Bernard Wand), taken in what must have been earlier litigation, as these are dated October 8, 1948, March 22, 1950, and April 16, 1954. Apparently these last three were introduced as defendants' exhibits, perhaps for the purpose of establishing certain admissions on the part of I. B. Wand.[2]

In the deposition first mentioned, that is, the one taken in the present case, Wand testified that he had to discontinue his operations; that his partner Alex quit in 1953, his brother George quit in 1954, and he himself liquidated his operations in 1956; this he said was because his crops were doing "worse every year". He attributed his poor crops to "nematodes" and these in turn to a "fluorine" condition, this evidently referring to the deposit of gases, etc., from the plant. He told about his plantings and acreages in 1954, 1955, and 1956; that the fluorine made the bulbs smaller than otherwise, and caused some leaf browning; that he grew no bulbs in 1957. He computed his damages on the basis of what he might earn growing bulbs, stating that such earnings should be from $10,000 to $12,-000 a year.

The pretrial order, in reciting the plaintiffs' contentions, states: "Plaintiff contends: (a) Defendant Henry W. Shoemaker, in the direction, supervision, and control of the operation of the said plant, committed the acts herein complained of from May 1, 1957, until the present, and such acts were authorized, directed and ratified and approved by defendant Reynolds Metals Company. (b) Since May 1, 1957, until the present, defendants have repeatedly invaded plaintiffs' property by depositing thereon the said gases, fumes and particulates." There is no evidence whatever as to what, if anything, the defendants actually did in the way of maintaining a nuisance, or otherwise, during the period beginning May 1, 1957, up until July 18, 1957, the date on which the release was executed.[3]

It is plain that if on May 1, 1957, the defendants began carrying on their operations in such manner as to create a nuisance, then a cause of action in I. B. Wand for the nuisance would immediately rise, and he could recover, had he filed a complaint on July 18, 1957, for damages up to that date. Without any question whatever, the release of July 18, 1957, would be a release of all claims of that kind. But the acts of the defendants following May 1, 1957, and continuing to July 18, 1957, might well give rise to a claim for much larger damages.

■ If the facts show that the nuisance created immediately following May

2. In the 1948 deposition the witness merely testified as to his activities as a farmer and bulb grower since 1936. He was questioned specifically concerning that year and the years 1940, 1941, 1942, 1943, 1944, 1945, 1946, 1947, and 1948. He stated the number of acres planted on the land (part of it leased land) and described the varieties of plants. In the 1950 deposition he testified as to the amounts and locations of plantings in 1949, and in the 1954 deposition he gave similar descriptions of his operations for the years 1950, 1951, 1952 and 1953.

3. After this appeal had been taken to this court, and the same had been allowed and notice of appeal filed, the trial court on August 14, 1961, granted the plaintiffs' motion to amend these portions of the

pretrial order by changing the date of May 1, 1957 to July 18, 1957. We note the query as to whether the court had any authority to make such an order at that time; but, apart from that, the statement in the complaint and in the pretrial order remains as an admission on the part of the plaintiffs that the wrongful acts complained of began May 1, 1957; and had the court taken adequate evidence on what happened in the following period, it is plain that it might have found that the plaintiffs' original allegation as to the date of the commencement was true and in accordance with the facts. Or, as hereafter indicated, it might have found that the claimed nuisance began even earlier than May 1, 1957.

1, 1957, was one likely to continue indefinitely, and if it arose from an operation which would not be enjoined, then there would arise in I. B. Wand an immediate right to recover not only for past but for prospective invasions of his land. The rule applied in such cases is stated in the Restatement of the Law of Torts, Sec. 930. This section, together with the Restatement's illustration of its operation is set forth in the margin.[4]

The question is whether the defendants' plant as of May 1, 1957, in sending forth gases and fumes, was doing so as an incident to the use of the plant, in a manner not avoidable by reasonable effort or expense, and hence the conditions created were likely to continue. The court might well refuse to enjoin such an operation.[5] As above indicated, it was stipulated that in 1949 defendants had expended $2,139,185 to install a system to minimize the escape of gases, fumes and particulates. The continued operation of this plant might not be enjoined particularly at the instance of the owner of 16 acres of bulb growing land. Harper & James, (The Law of Torts, Sec. 1.30, Vol. 1, p. 91), states the rule thus: "But if the nuisance cannot be abated, or is such that the court will not enjoin its continuance, all damages must be obtained in one action." In referring to authorities on this matter, Mr. Prosser, (Handbook of the Law of Torts, 2nd ed., p. 410), says: "Whether the plaintiff may bring a single action for past and prospective damages, or successive actions for the continuing tort, has been made to turn in the case of nuisance, as well as trespass, upon the permanent nature of the condition created, and the

4. "Sec. 930. Damages for Future Invasions. (1) Where, by the maintenance of a structure on his own land or by acts and operations thereon, a person causes continuing or recurrent tortious invasions of the land of another, the other is entitled to recover for future invasions, if, and only if, it appears that (a) the situation will continue indefinitely and (b) it is incident to i. an enterprise affected with a public interest, the operation of which as presently operated will not be enjoined, or ii. other enterprises if the injured person so elects. (2) The damages for past and prospective invasions of land include (a) compensation for harm caused by invasions prior to the time when the injurious situation became complete and comparatively enduring and (b) compensation for i. the amount of diminution in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring, or ii. the reasonable cost to the plaintiff of avoiding future invasions."

"Illustration: 1. The A company, making illuminating gas from coal, established its plant near B's extensive greenhouse and florist establishment in 1930. The operations of the gas plant began in 1931 and fumes and smoke invaded the greenhouse and damaged the flowers. This damage, small at first, reached a peak in June, 1932, when the gas plant first began to be operated to full capacity. It has since been carried on at the same level, and the damage to B's business has continued. In 1933 B sues A for damages, and at the trial elects complete compensation, once for all. B's damages will be measured by the loss of flowers and loss of profits down to June, 1932, and in addition, by the difference between what a reasonable purchaser would have given for the property and business in June, 1932, in view of the existing and prospective nuisance, and what he would have given if it were not there. No damages will be given for loss of flowers and profits from June, 1932, down to the time of trial."

5. Cf. Booth-Kelly Lumber Co. v. City of Eugene, 67 Or. 381, 136 P. 29. See, also, Comment b to the Restatement quoted above: "* * * But if the invasions are caused by some substantial and relatively enduring feature of the plan of construction or from an essential method of operation, then it will usually not be abatable by injunction, and the desirability of granting the injured person complete compensation for past and future invasions is apparent." And compare Harper and James, supra, Vol. 1, p. 91: "After another balancing process, the court may come to the conclusion that the hardship occasioned to the defendant by enjoining his entire activity might so outweigh the harm caused to the plaintiff by its continuance that the latter must be content with the recovery of damages."

likelihood that the defendant will terminate it rather than pay a subsequent claim."[6]

In Bainbridge Power Co. v. Ivey, 41 Ga.App. 193, 152 S.E. 306, cited by Prosser, the court said: "A permanent nuisance is not necessarily one which can never, under any circumstances, be abated; but it is one whose character is such that, from its nature and under the circumstances of its existence, it presumably will continue indefinitely."

■ It is plain from this record that we cannot tell whether on July 18, 1957, Wand had the right to sue for permanent damage to his land. If he had such a right it would appear that it was released by the July 18, 1957, release, because the language of that release appears to be all-inclusive. The release is "from all and all manner of actions and causes of action, suits and causes of suit, trespasses, damages, charges, expenses, debts, dues, sums of money, covenants, contracts, agreements, promises, claims and demands of any kind or nature. * * *"

The problem of whether Wand's claim prior to July 18, 1957, was one in which he might have recovered permanent damages, is not a simple one. As indicated in the Restatement, supra, section 930, sub. (1) (b) i, ii, the case would be more clear if Reynolds Metals Company were engaged in the operation of a public utility or a business affected with some sort of public interest. We assume that such is not the case here.[7]

■ The case of Spaulding v. Cameron, 38 Cal.2d 265, 239 P.2d 625, was one in which the nuisance which caused injury to the plaintiff's land was created by one who was not engaged in a public enterprise. In that case the court found itself handicapped, as we do here, by the lack of adequate findings such as whether the nuisance was in fact permanent and whether the nuisance could or could not be abated. But the court stated the problems presented in such a case as follows: (p. 628, 239 P.2d)

"A more difficult problem is presented, however, if the defendant is not privileged to continue the nuisance or trespass but its abatement is impractical or the plaintiff is willing that it continue if he can secure full compensation for both past and anticipated future injuries. To attempt categorically to classify such a nuisance as either permanent or not may lead to serious injustice to one or the other of the parties. Thus, if the plaintiff assumes it is not permanent and sues only for past damages, he may be met with the plea of res judicata in a later action for additional injury if the court then decides the nuisance was permanent in character from its inception. * * * Similarly, if the initial injury is slight and plaintiff delays suit until he has suffered substantial damage and the court then determines that the nuisance was permanent, the defendant may be able to raise the defense that the statute of limitations ran from the time of the initial injury. * * * On the other hand, if the defendant is willing and able to abate the nuisance, it is unfair to award damages on the theory that it will continue. * * *

"Because of these difficulties it has been recognized that in doubtful cases the plaintiff should have an election to treat the nuisance as either permanent or not. * * * If the defendant is not

---

6. In a footnote, Mr. Prosser states: "The expense or inconvenience of abatement is an important factor to be considered."

7. One odd thing about the release in question is that it recited that the United States, the Reconstruction Finance Corporation, and the Defense Plant Corporation, all had at various times some interest or part in the operation of this plant. Apparently at some of the dates recited in the release, the plant belonged to the United States and was operated by the appellant as lessee. Whether the nuisance here involved became permanent in character and did so at a time when the United States had an interest in the plant, as a part of its defense effort, and whether such a situation made this plant one affected with a public interest, is something we need not consider at this time.

privileged to continue the nuisance and is able to abate it, he cannot complain if the plaintiff elects to bring successive actions as damages accrue until abatement takes place. * * * On the other hand, if it appears improbable as a practical matter that the nuisance can or will be abated, the plaintiff should not be left to the troublesome remedy of successive actions. See, Restatement, Torts, § 930, comment c; McCormick, Damages for Anticipated Injury to Land, 37 Harv.L.Rev. 574, 594–595."

In our view that case states the correct general rule and one which we believe will be followed in Oregon.

Here it is to be noted that in the pre-trial order plaintiffs' contentions are stated to indicate that they are seeking damages for permanent injuries. Thus plaintiffs' claim is stated to be that the invasion of the gases, etc. "has rendered plaintiffs' said lands unfit for the growing of bulbs, bulblets and flowers thereon, and has deprived plaintiffs of the use and enjoyment of their said property."

The question is whether the plaintiffs here had a right to bring an action for past and prospective damages on July 18, 1957; if they had that right the release was fully effective as to I. B. Wand. Cf. Razzano v. Kent, 78 Cal.App.2d 254, 177 P.2d 612, Slater v. Shell Oil Co., 58 Cal. App.2d 864, 137 P.2d 713, 715.[8]

We do not undertake upon the limited record here before us to pass upon this question. As in the case of Spaulding v. Cameron, supra, we think the case must be remanded to the trial court so that the facts may there be developed to permit a conclusion upon this question.

From what has been said here, it seems apparent that no economy of judicial time or effort can be secured through an appeal from an interlocutory order. It is plain that only after all the facts and circumstances relating to the alleged nui-

sance, the condition of defendants' plant, the apparent permanence of the effusion of gases and fumes, and all other related circumstances, have been gone into completely, can the court make and determine whether prior to July 18, 1957, I. B. Wand had a cause of action for all or a portion of the damages sought in this action. Until that time the court is not warranted in making any determination as to the effect of that release. If such an inquiry is required, it would seem that the court might as well proceed to the trial of the action itself which will necessarily bring out proof as to the permanence or lack of permanence of the nuisance.

The judgment is reversed.

---

8. The record here shows nothing as to who Alice R. Wand may be, whether she is the wife or other relative of I. B. Wand, or otherwise. At the trial of this case her capacity will appear. It seems possible that she has been joined as a plaintiff merely because she is the wife of I. B. Wand. In this opinion we do not assume that the release in question affected any independent right which she may have.