PAUL N. BARCI *et al., Appellants,* v. INTALCO ALUMINUM CORPORATION, *Respondent.*

*Ferguson & Burdell, William H. Ferguson, W. Wessel-hoeft, Gust S. Doces, Pemberton & Bentley,* and *Joseph Pemberton (Tooze, Kerr, Peterson, Marshal & Shenker* and *Arden Shenker,* of counsel), for appellants.

*Lane, Powell, Moss & Miller, G. Keith Grim, Richard F. Allen, Robert R. Davis, Jr., Abbot, Lant & Fleeson, Richard Fleeson, Detels, Draper & Marinkovich,* and *J. Richard Crockett,* for respondent.

CALLOW, J.—The plaintiffs, Paul G. Barci and Paul N. Barci, are father and son. They have owned and operated farm property near Ferndale, Washington, since the early part of the century. The defendant, Intalco Aluminum Company, constructed and commenced the operation of its aluminum reduction plant near the plaintiffs' property in 1966. The plaintiffs brought suit for damages to their real property, to their cattle and to themselves individually, caused by pollutants from the plant. Liability was admitted by the defendant leaving the amount of damages as the sole issue to be decided by the jury.

The jury returned the following verdict:

We, the jury, find for the plaintiffs and assess their damages as follows:

A. For physical and mental pain, injury, disability and suffering:

   1. As to the plaintiff Paul G. Barci, the sum of $0.

   2. As to the plaintiff Paul N. Barci, the sum of $0.

B. For irritation, annoyance and anguish:

   1. As to the plaintiff Paul G. Barci, the sum of $30,000.00.

   2. As to the plaintiff Paul N. Barci, the sum of $5,000.00.

C. As to the plaintiffs Paul G. Barci and Paul N. Barci:
1. For damage to cattle the sum of $17,310.00.
2. For loss of the use and enjoyment of plaintiffs' property the sum of $30,750.00.
3. For damage to trees and shrubs, the sum of $0.

The plaintiffs challenge the award as inadequate.

The plaintiffs argue that the trial court erred in (a) precluding the testimony of a medical witness on behalf of the plaintiffs, (b) excluding the opinion testimony of an expert witness for the plaintiffs, and (c) permitting testimony as to fair market value by expert appraisers called by the defendant.

The first issue raised by the plaintiffs concerns the exclusion of the testimony of a doctor called to testify about physical injuries to the plaintiffs. In their original and first amended complaints filed in 1970, the plaintiffs alleged that pollutants from the defendant's plant had injured them. In February 1971, the plaintiffs filed another amended complaint which reiterated the allegation for personal injury damages. Throughout 1971, the plaintiffs alleged that they had suffered personal injury, but they were unable to supply medical proof of such injuries.

The case initially went to trial on October 4, 1971. In the second day of trial, a plaintiffs' motion for continuance was granted. Two days later, the plaintiffs filed another complaint claiming that the defendant's factory had emitted fluorides which were injurious to human life and that said emissions had caused injury to the eyes, sinuses, and respiratory tracts of the plaintiffs. The plaintiffs were deposed for a second time on January 12, 1972, and said they had no present appointments to be examined by any medical practitioner with regard to any of their medical conditions. At that deposition, Paul G. Barci replied in the negative when asked whether he had any medical problem as a result of pollutants other than watering of his eyes.

Counsel had agreed to notify each other of the names of witnesses to be produced at trial. The second trial was scheduled to begin February 22, 1972. On February 11 or

12, the plaintiffs' counsel advised the defense they might call Dr. S. Thatcher Hubbard as a witness. Defense counsel was informed that the plaintiffs would be examined in Spokane by Dr. Hubbard on February 15, 1972. On February 15, 1972, the matter of the testimony of Dr. Hubbard was taken up with the trial court on a preliminary motion, and the court ruled that the defense could depose Dr. Hubbard in Spokane prior to trial. Immediately following the examination, plaintiffs' counsel notified the defense they intended to call the doctor as a witness. On February 16, counsel for the defendant retained a Spokane attorney to depose Dr. Hubbard, but the doctor was unavailable because of previous appointments. When the defendant was unable to depose the doctor before trial, counsel moved, in the alternative, to exclude his testimony or for a continuance of the trial date. This motion was filed February 17, 1972.

At the opening of trial on February 22, 1972, the defense counsel brought on this motion for argument. The trial court withheld ruling on the motion but declared that the doctor could come to Bellingham to be deposed on Thursday evening, February 24. The doctor was deposed on that date, and the defendant claims it then first learned that Dr. Hubbard would testify he found a permanent total disability in one plaintiff and a 50 percent permanent disability which would progressively worsen in the other plaintiff. The next day (Friday, February 25, 1972) plaintiffs' counsel called Dr. Hubbard to the stand, and the defense counsel renewed their motion to exclude his testimony. They argued they were surprised by the witness' opinion with respect to the degree of permanent disability suffered by both plaintiffs as a result of their exposure to fluorides. The trial court ruled the testimony would be excluded. Thereupon, counsel for the plaintiffs attempted to make an offer of proof concerning the doctor's testimony, and the trial court refused to permit an offer of proof to be made. Some

days later, this court issued an order directing the trial court to permit counsel to make an offer of proof.[1]

On Monday, February 28, 1972, plaintiffs' counsel advised the trial court and counsel that they intended to offer Dr. Hubbard's testimony at the end of their case in chief. Following argument on Thursday, March 2, the trial court announced the doctor could testify but later in the afternoon reversed its ruling and excluded the proposed testimony. During argument on the motion, the defense counsel reportedly attempted to contact pulmonary experts in Seattle but were unable to do so. The plaintiffs' counsel challenged the claimed unavailability of pulmonary specialists. Plaintiffs emphasized they would be prepared to offer Dr. Hubbard's testimony at the conclusion of the entire case. On Monday, March 6, plaintiffs' counsel moved for reconsideration of the matter. The motion was denied. On March 9, the plaintiffs moved for permission to reopen their case in chief and offer the testimony of Dr. Hubbard, and the motion was denied.

An offer of proof was made that the doctor's testimony would have been that he had examined both plaintiffs on February 14, 1972, and concluded that plaintiff Paul N.

---

[1]The trial lawyer has a right to make the record for appeal. The trial judge must permit counsel to make an offer of proof in the absence of the jury so that the propriety of the proposed, but excluded, evidence may be examined as to admissibility. An offer of proof stands in the same position as a pleading and must be made so the trial court may rule advisedly and so an exception to the exclusion of the offered evidence may be preserved. *Lannan v. Garrett,* 23 Cal. App. 2d 367, 73 P.2d 620 (1937); *In re Estate of Vallish,* 431 Pa. 88, 244 A.2d 745 (1968); *Jones v. Clark,* 418 P.2d 792 (Wyo. 1966); 88 C.J.S. *Trial* § 73 (1955). The offer may be rejected (though it must be recorded) where the language of the offer is vague, general and not sufficiently specific to inform the trial court concerning the evidence that the proponent wishes to present. *Tomlinson v. Bean,* 26 Wn.2d 354, 173 P.2d 972 (1946); *Godefroy v. Hupp,* 93 Wash. 371, 160 P. 1056 (1916). The exclusion by the court of a proffer of testimony by interrogating the witness or by counsel reciting the evidence that would be presented precludes review and is erroneous. *Musachia v. Terry,* 140 So. 2d 605 (Fla. App. 1962); *State v. Davis,* 155 Me. 430, 156 A.2d 392, 89 A.L.R.2d 277 (1959); *Vanover v. Vanover,* 77 Wyo. 55, 307 P.2d 117, 62 A.L.R.2d 931 (1957).

Barci had a pulmonary fibrotic injury which was both permanent and irreversible and that Paul G. Barci had permanent pulmonary fibrosis and chronic inflammatory pulmonary disease. The offer of proof was that the doctor would have testified further that the plaintiff Paul N. Barci was 50 percent disabled and Paul G. Barci was totally disabled because of the pulmonary disease. Finally, the offer of proof was that in the opinion of Dr. Hubbard these diseases were the result of exposure to fluorides from the defendant's aluminum plant. The plaintiffs then made offers of proof relative to surprise. This offer proffered testimony by Dr. Hubbard that he was not available for a deposition prior to February 24 because of unbreakable commitments and further that an examination of the plaintiffs substantially before February 14, 1972, might not have revealed the present seriousness of their condition.

The plaintiffs contend that they were prejudiced by the refusal to allow Dr. Hubbard to testify. The lengthy recitation of the factual situation leading up to the exclusion of the witness has been necessary for the consideration of this assignment of error.

The following cases touch upon the propriety of the trial court's exclusion of the medical specialist on respiratory problems. In *Sather v. Lindahl,* 43 Wn.2d 463, 465, 261 P.2d 682 (1953), the trial court's granting of a new trial where the plaintiff had denied knowledge of any witnesses to an accident in a deposition taken 4 days before trial and then produced such witnesses at trial was reversed because the defense counsel had failed to object timely to the surprise testimony. The decision held:

> When, after denying knowledge of witnesses which he in fact had, a litigant produces those witnesses at the trial, the adverse party should object to their being permitted to testify and, if they are permitted to testify, should move that their testimony be stricken. The trial judge can sustain such an objection and refuse to permit the witness to testify or can order his testimony stricken; or he can grant a continuance to give the surprised party an opportunity to investigate the witness and secure rebut-

tal testimony; and it is possible that, under circumstances in which no other relief or penalty could remedy the situation created by the deception, he could grant a mistrial.

The *Sather* case involved an intentional violation of the discovery rules by the withholding of the names of known witnesses. The record here establishes (and the parties concede) that the rules of discovery were not violated.

In *Talley v. Fournier*, 3 Wn. App. 808, 479 P.2d 96 (1970), the trial court's refusal to allow a witness to testify was affirmed where the counsel had stated that only two witnesses had been subpoenaed to testify and then called a previously undisclosed third witness. The failure to disclose the witness was denounced as an unfair trial tactic, and the excluded testimony from that witness was held to be within the discretion of the trial court. In *Northwestern Mut. Ins. Co. v. Stromme*, 4 Wn. App. 85, 479 P.2d 554 (1971), the trial court excluded the testimony of an expert witness contacted by the plaintiff after the plaintiff had answered the initial interrogatories propounded by the defendant. The trial court found the interrogatories to be continuing, requiring the disclosure of the identity of the expert witness. The appellate decision held that interrogatories could be continuing only where they were so identified specifically. The interrogatories in this case were not designated as continuing. Since the holding in *Northwestern Mut. Ins. Co. v. Stromme* and following the trial of this cause, CR 26 has been amended, effective July 1, 1972, to provide in part:

(e) Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) the identity of each person expected to be called as an expert

witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

(3) A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through new requests for supplementation of prior responses.

(4) Failure to seasonably supplement in accordance with this rule will subject the party to such terms and conditions as the trial court may deem appropriate.

In this case, the record supports that Dr. Hubbard's existence was disclosed to the defense as soon as possible and in advance of trial. The record does not indicate that the plaintiffs intentionally delayed in discovering or disclosing Dr. Hubbard. Rather, it appears that the plaintiffs had considerable difficulty in finding a medical expert to testify in their behalf. The delay did not result from tactical considerations.

■ Among the factors that are material to a trial court's decision to exclude or allow testimony from a witness who was unobtainable and was undisclosed either until just before trial commenced or during the course of trial are (a) the presence or absence of good faith attempts by the proponent of the witness to comply with the rules of dicovery, (b) the availability or discoverability of the witness at an earlier time, (c) the circumstances of the proponent at the time of the securing of the witness, i.e., whether a physical injury or illness had progressed to a point where diagnosis and/or prognosis was possible and/or whether the passage of time had made the consequences of the acts of the parties discernible to an expert witness at an earlier time, (d) the materiality of the proposed testimony to the proponent, (e) the extent of surprise to the opponent, (f) the availability of opportunity to the opponent to depose

the witness, (g) the availability of opportunity to the opponent to prepare for cross-examination, (h) the opportunity to the opponent to secure contradicting witnesses, (i) the prejudice presented to a proponent or opponent's case if a continuance is granted, (j) the impact upon both parties of the expenses of delay, and (k) the ability of an imposition of costs upon a proponent to remedy any hardship imposed upon an opponent by the late calling of a witness. *Plonkey v. Superior Court*, 106 Ariz. 310, 475 P.2d 492 (1970); *Smith v. Babcock*, 157 Mont. 81, 482 P.2d 1014 (1971); *Fredrickson v. Louisville Ladder Co.*, 52 Wis. 2d 776, 191 N.W.2d 193 (1971). In *Jones v. Atkins*, 120 Ga. App. 487, 490-91, 171 S.E.2d 367, 369 (1969), it was stated:

> As pointed out in cases involved with this type of situation, where a witness does not become known until shortly before trial and prompt answer is made upon discovery of such witness the court should not exclude the witness's testimony. See Anno., 27 ALR2d 737 and 4 Moore's Federal Practice (2d Ed.) 1254, § 26.19[4]. *Exclusion is proper only where a party deliberately withholds the names of his witnesses*. See Ceco Steel Products Corp. v. H. K. Porter Co., 31 F.R.D. 142.
>
> However, the primary concern of the Federal rules, which have been followed by this State, is the prevention of surprise. While the witness's testimony should not be excluded, this does not mean that opposing counsel should not have some appropriate amount of time to interview such witness and to check the facts to which he would testify.
>
> The rationale in Nathan v. Duncan, 113 Ga. App. 630, 641 (149 SE2d 383), where objection was made to the testimony of certain previously undisclosed witnesses, was "proper procedure when they were called to testify was not to object to their testifying or to the admission of their testimony, but to move for a postponement of the trial for a sufficient length of time to enable the defendant to interview them, check the facts to which they would testify, and, if indicated, arrange to secure rebuttal evidence or to impeach them. It would be an abuse of discretion, requiring the grant of a new trial, to refuse the postponement. If this should not come up until the trial was already under way and the court determined

that a postponement was impracticable, a mistrial should be declared." See Sather v. Lindahl, 43 Wash. [2d] 463 (261 P2d 682). Here, of course, the trial judge should exercise his discretion as to the length of time that would be necessary for counsel; however, it was error, requiring the grant of a new trial, to allow no time whatsoever upon timely request.

(Italics ours.)

Where pretrial discovery rules have been violated, the court may penalize the offender under CR 37. See Trautman, *Discovery in Washington*, 47 Wash. L. Rev. 409, 436 (1972). However, a trial court should not exclude testimony unless there is a showing of intentional or tactical nondisclosure, of willful violation of a court order, or the conduct of the miscreant is otherwise unconscionable. *Dorsey v. Academy Moving & Storage, Inc.*, 423 F.2d 858 (5th Cir. 1970); *B.F. Goodrich Tire Co. v. Lyster*, 328 F.2d 411 (5th Cir. 1964); 2 L. Orland, Wash. Prac. § 175 (1972, Supp. 1974); 4 J. Moore, *Federal Practice* ¶ 3703 (1969); Annot., 27 A.L.R.2d 737 (1953). There is no violation of the discovery rules whether they be viewed as they existed at the time of the trial or as they exist at present. The doctor must be permitted to testify to the pulmonary injuries, if any, to the plaintiffs. *See also Fredrickson v. Louisville Ladder Co.*, 52 Wis. 2d 776, 191 N.W.2d 193 (1971).

■ The trial court did not allow a veterinarian-toxicologist called by the plaintiffs to testify concerning the weight that Hereford cattle could be expected to gain under normal conditions. We hold this challenged ruling to have been proper. Whether a witness has been qualified as an expert is to be discerned by the perception of the trial court. *Hill v. C. & E. Constr. Co.*, 59 Wn.2d 743, 370 P.2d 255 (1962); *Gerberg v. Crosby*, 52 Wn.2d 792, 329 P.2d 184 (1958); *Buerkli v. Carstens Packing Co.*, 122 Wash. 458, 461, 210 P. 798 (1922). When the trial court has determined that the witness possesses the pertinent expertise, the decision will be upheld unless the determination was manifestly wrong. *Reefer Queen Co. v. Marine Constr. & Design Co.*,

73 Wn.2d 774, 440 P.2d 448 (1968). In *Dobias v. Western Farmers Ass'n,* 6 Wn. App. 194, 197, 491 P.2d 1346 (1971), it was said:

> An expert may state his opinion on a subject matter which is beyond the knowledge of the average layman, and within the realm of his expertise. 5 Meisenholder, Wash. Prac. § 351, p. 329 (1965). Dr. Maloy's credentials are impressive. However, by his own frank admission, his expertise did not extend to sweet corn. The qualification of an expert to give opinion testimony is a matter within the sound discretion of the trial court and its determination will not be disturbed unless that discretion is manifestly abused. *Duchsherer v. Northern Pac. Ry.,* 4 Wn. App. 291, 481 P.2d 929 (1971).

At the stage in the proceedings when objections initially were made to questions of the witness concerning weight gain in cattle, the background, knowledge and experience of the witness on that subject had not been established. *See Duchsherer v. Northern Pac. Ry.,* 4 Wn. App. 291, 481 P.2d 929 (1971). The qualifications of the witness as an expert familiar with livestock production were established later in the proceedings but further attempts were not made to establish expertise concerning weight gain. When the objection was made to the witness' qualifications, the conclusion of the trial court that expert qualifications had not been demonstrated in the area of inquiry was a conclusion within the trial court's discretion.

The plaintiffs' final contention, as we perceive it, is that the admission of the testimony of the defendant's expert real estate appraisers as to the market value of the farmland was error. Their position is that they seek damages for temporary nuisance, the correct measure of which is the loss of use or rental value; and, therefore, testimony concerning the fair market value of the land, before and after the construction of the plant, is irrelevant. The discussion of this issue should be read in conjunction with the discussion hereafter of the challenge by the defendant to the instruction on the measure of damages.

There is evidence in the record to support the conclusion

either that the damage was temporary or the conclusion that it was permanent. It was the responsibility of the jury to draw either one conclusion or the other. Evidence concerning both the amount of loss in the event the damage was temporary and the actual reduction in fair market value in the event the property was permanently damaged was properly admitted. *See Drake v. Smith,* 54 Wn.2d 57, 337 P.2d 1059 (1959); *Anderson v. Port of Seattle,* 49 Wn.2d 528, 304 P.2d 705 (1956); *Riblet v. Spokane-Portland Cement Co.,* 45 Wn.2d 346, 274 P.2d 574 (1954).

The defendant has cross-appealed and assigned error to the instruction on the measure of damages. No error has been assigned to this instruction insofar as damages for temporary or permanent harm to real property are concerned. Consequently, we take no position on this aspect of the instruction. The defendant argues that the instruction would permit the plaintiffs to recover damages, first for loss of enjoyment as an element within "loss of use and enjoyment" and, secondly as an element within "anguish, irritation and annoyance." We hold that the term "enjoyment" could mislead the jury and should be omitted from the instruction upon retrial of the cause.

A prior instruction given by the trial court properly segregated the areas of recovery as damages to property, *i.e.,* to land, trees and cattle and as damages to the person for physical injury and mental distress. The term "use and enjoyment" commonly expresses the utilization and management of real property by its owner. *A & B Cabrini Realty Co. v. Newman,* 237 N.Y.S.2d 970 (N.Y. City Civ. Ct. 1963); *Evans v. Reading Chemical Fertilizing Co.,* 160 Pa. 209, 28 A. 702 (1894). The words "use" and "enjoyment" in the court's instruction inject an unneeded redundancy into the deliberations. Further, when the term expresses concepts regarding the utilization of property in the same instructions that express concepts regarding the mental harm done the owner by injury to his land, the word "enjoyment" may be confusing and appear overlapping to a

jury. As noted in *Reynolds Metals Co. v. Lampert*, 316 F.2d 272, 274 (9th Cir. 1963):

> Appellees next contend that if appellants' requested instructions were given, an element of compensation would have been excluded. They seem to equate loss of "enjoyment," as used in the term "use and enjoyment," with the concept of "annoyance, inconvenience and discomfort," which we will assume would have been a proper additional element of damage below. See Quillen v. Schimpf, 133 Or. 581, 291 P. 1009; Porges v. Jacobs, 75 Or. 488, 147 P. 396; 4 Restatement of the Law of Torts, Section 929.
>
> . . . Moreover, in his instructions, the District Judge seems to have used "use" and "enjoyment" interchangeably, which would tend to mislead the jury.

As observed by 4 Restatement of Torts § 929 (1939):

> Where a person is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction in value, the damages include compensation for
> (a) at the plaintiff's election
> i. the difference between the value of the land before the harm and the value after the harm or the cost of restoration which has been or may be reasonably incurred, or
> ii. if a separable portion of the land has been damaged, the loss in its value, and
> (b) the loss of use of the land and
> (c) discomfort and annoyance, in an action brought by the occupant.

In Comment on Clause (c) it is noted:

> *g. Discomfort and other bodily and mental harms.* Discomfort and annoyance to an occupant of the land and to the members of his household are distinct grounds of compensation for which in ordinary cases the person in possession is allowed to recover in addition to the harm to his proprietary interests.

*See also Riblet v. Spokane-Portland Cement Co., supra.* The instruction appropriately covered the right to recover for injury to an owner's proprietary interest in land and to

recover for personal mental distress at seeing the land damaged.[2]

A further discussion of temporary as distinguished from permanent damage to land may assist in the drafting of instructions on retrial. Whether damage to land is temporary or permanent is a question of fact. *Drake v. Smith, supra* at 60 said:

> We do not agree with defendants' contention that there is no evidence to support the finding that the pollution is permanent. There is evidence, which the trial court chose to believe, that defendants had no intention of removing the . . . debris from the stream, nor of removing the fills from the creek. This is sufficient to meet the test announced in *Haveman v. Beulow*, 36 Wn. (2d) 185, 217 P. (2d) 313, 19 A.L.R. (2d) 763 (1950), wherein this court said:
>
> "The court was of the opinion that the damage to the land should be regarded as permanent, and that, by reason of the destruction of the wells for domestic uses, their respective farms had been depreciated in value. An injury of the kind in question may be permanent in a legal sense, though not coextensive with perpetual, unending or unchangeable. *Union Oil & Mining Co. v. Bowman*, 144 Okla. 54, 289 Pac. 296."

It is for the trier of the fact to decide whether the de-

---

[2] ". . . In view of the fact that a trespassory action for air pollution in which no actual damages are sought is unlikely, this distinction between trespass and nuisance loses much of its significance. Compensatory damages may be recovered both in trespass and nuisance. Such compensatory damages will include all of the damages that demonstrably flow from the emissions concerned. These have in the past included damage to buildings, damage to crops and livestock, and—what is somewhat unusual for actions based on injury to land— they have also included damages for personal injuries to health. In the case of damage to buildings, the measure of damages is the reduction in the value of the building following its exposure to the emissions. In the case of crops, the measure of damages is the reduction in the value of the crop from the value that could otherwise have been expected, taking into account market conditions at the time of their expected sale. In the case of livestock, a similar measure of damages is applicable, particularly in the case of dairy herds where the loss in productivity following exposure to harmful emissions is the measure." (Footnotes omitted.) 1 F. Grad, *Treatise on Environmental Law* § 2.02 (1973).

fendant will have the ability and intent to correct the emission of fluorides onto the land of the plaintiffs in the future.

Where the injury to land is temporary, the measure of damages is the diminished rental value if the property is to be rented, or the diminished value of its use if the property is to be used by the owner. *Papac v. Montesano,* 49 Wn.2d 484, 303 P.2d 654 (1956); *Riblet v. Spokane-Portland Cement Co.,* 45 Wn.2d 346, 274 P.2d 574 (1954); *Riblet v. Spokane-Portland Cement Co.,* 41 Wn.2d 249, 248 P.2d 380 (1952). Where injury to land caused by pollution is permanent and irreparable, the measure of damages is the difference in the market value of the property before and after creation of the nuisance. *Drake v. Smith, supra; Anderson v. Port of Seattle, supra; Haveman v. Beulow,* 36 Wn.2d 185, 217 P.2d 313, 19 A.L.R.2d 763 (1950). A jury should be directed in its deliberations as to the measure of damages where the injury to land is transient in nature, where the injury is permanent and should be assisted to properly correlate and link together those damages suffered in the past with those which will be suffered in the future. *Reynolds Metals Co. v. Wand,* 308 F.2d 504 (9th Cir. 1962); 4 Restatement of Torts §§ 929-30 (1939).

Reversed and remanded for further proceedings consistent with this opinion.

HOROWITZ and FARRIS, JJ., concur.

Petition for rehearing denied August 29, 1974.

Review denied by Supreme Court November 19, 1974.