[No. 31200.   Department One.   April 13, 1950.]

H. J. HAVEMAN *et al., Respondents,* v. C. F. BEULOW *et al.,*
*Appellants.*[1]

[1]Reported in 217 P. (2d) 313.

*Sather, Livesey & Kingsbury,* for appellants.

*Abrams, McCush & Rinker,* for respondents.

GRADY, J.—This action was instituted by the plaintiffs to recover damages resulting from the pollution of the water of their wells by refuse matter from the dehydrating plant of defendants and to secure injunctive relief. The court awarded each of the plaintiffs a money judgment, enjoined the maintenance of a nuisance and directed its abatement.

Material facts found by the court are as follows: The respondents own and reside upon tracts of farm land in Whatcom county. On each tract is a well furnishing water for domestic purposes. One well is fifteen feet deep and has a concrete casing and cover. The water level is eight or nine feet below the surface. Another well is of the same depth with concrete sidings and cover and has a seven-foot water level. The other well is ten feet deep, has cedar casings and cover, with a water level of seven feet. The nature of the soil in the immediate area was described as red cedar top soil for two to two and one-half feet with gravel and sand below. The slope of the land and the nature of the sub-soil is such that the natural flow of surface and subterranean waters in the area is generally in a southwesterly direction.

In January, 1944, appellants commenced to operate a manufacturing establishment to dehydrate potatoes, which business they conducted through the fall of 1947, and thereafter, processed potatoes into potato flour. In 1945, appellants constructed an open sump covering an area of ten acres and which was diked on the southerly and westerly sides, the highest point of the dike being approximately three and one-half feet above the surface of the ground at its southwest corner. The sump was used by appellants for the deposit of wash waters from the processing operations

as well as peelings, scrapings, cuttings, droppings, and other potato offal.

The appellants allowed the potato refuse to accumulate in the sump, and at the time of the commencement of the action, its depth at the southwest corner was approximately two and one-half feet, and about one and one-half feet at the place where it entered the sump. This residue was of a mushy nature. The odor arising from the refuse became clearly discernible from respondents' properties, and was offensive to the senses. The wells are located southwest of the sump at distances of six hundred fifty to nine hundred feet. In about April, 1947, respondents noticed a marked change in their well waters in that they had taken on an offensive taste and odor. This odor varied in intensity from time to time, but was particularly offensive when the water was heated. The water also commenced to show a higher iron content. Prior to that time, the waters in the wells had been suitable for domestic uses, but by reason of the changes they ceased to be useable for those purposes.

The appellants complain that the court did not give sufficient weight to expert testimony submitted by them which they claim refuted the contention that the refuse in the sump had anything to do with the contamination of the well water, and that the findings were based upon speculation and conjecture. Expert testimony was also submitted by respondents. The experts differed in their conclusions. The trial judge stated in his oral decision that such testimony was of little assistance in determining the factual question involved. His findings were based on the respective locations of the sump and the wells, the slope of the land from the former to the latter, the nature and character of the soil, the fact that prior to the construction and use of the sump the wells had furnished for many years a supply of pure and wholesome water suitable for domestic uses, but after the sump had been in operation for a time the water became unwholesome, and that the condition had continued all of the time the sump had been in operation thereafter; also,

that other wells in the neighborhood out of the seepage area of the sump were not affected.

The court concluded from the evidence submitted that the pollution of the waters of the wells was caused by seepage from the sump operated by appellants. We have read the statement of facts and examined the exhibits, and our conclusion is that the findings of fact are supported by a preponderance of the evidence.

Other claims made by appellants are: (1) the court was in error in holding that evidence tending to show the pollution came from sources other than alleged in the complaint was not admissible under the general denial made by appellants in their answer; (2) the court adopted an incorrect measure of damages, and (3) the court erred in granting relief by way of injunction and abatement.

■ The complaint alleged that the seepage from the sump polluted the water in the wells of respondents. The answer to these allegations was a general denial. The burden of proof was upon the respondents to prove that the pollution came from the sump. The appellants had the right under their denial to go forward with evidence showing that the pollution came from other sources than the sump. Such evidence would have the effect of destroying the cause of action set forth in the complaint and would not be made merely in avoidance thereof, and hence would be admissible under the general denial. *Clark County etc. Corp. v. Hiim,* 177 Wash. 251, 31 P. (2d) 905; *Hardman v. Younkers,* 15 Wn. (2d) 483, 131 P. (2d) 177, 151 A. L. R. 868; *Brown v. Jones,* 137 Ore. 520, 3 P. (2d) 768; *Interstate Public Service Co. v. Weiss,* 208 Ind. 122, 193 N. E. 226; *Chesapeake & O. R. Co. v. Carmichael,* 298 Ky. 769, 184 S. W. (2d) 91.

■ However, the record is such we are not disposed to reverse the judgment and remand the case for the purpose of having the court receive and consider such evidence. When two of the respondents were being cross-examined, they were permitted, over objection, to be interrogated as to the presence of barns, chicken houses, outhouses, septic

tanks, and manure piles, and in response they admitted their presence and location with reference to the wells. The objections were that such interrogation was not proper cross-examination, and that the matter was affirmative and was not pleaded. The court allowed the questions to be answered upon the theory that they related to a description of the properties. At an early stage of the defense, one of respondents was asked about the presence of piles of manure on the farms, to which objection was made upon the ground that such evidence was not admissible under a general denial. The objection was sustained. The matter was not pursued further until the close of the evidence submitted by appellants when counsel addressed the court and said:

"We, once more, offer to prove by Mr. Maloy and Mr. Soine the existence of manure piles, chicken yards, outhouses, and the like, all within a relatively short distance, anywhere from twenty-five to two hundred feet from the wells in question."

The court responded: "Those views are in evidence, I believe, in any event." The offer added nothing to that which had already been admitted by respondents. There was nothing in the offer to indicate that there would be any additional proof that the pollution came from the sources mentioned, and without such affirmative proof there would be no evidence controverting the proof submitted by respondents. The claimed sources of pollution had been in existence a considerable time prior to the change in the waters after the commencement of the use of the sump. The court would not have been justified in drawing any inference sufficient to overcome the evidence submitted by respondents from the offered evidence. The record does not present a case of reversible error.

Upon the question of the measure of damages, two theories were advanced, and considered by the court: (a) the expense necessary to be incurred by respondents in securing water from the city of Lynden, (b) the difference between the fair market value of the respective farms of respondents having a source of suitable water supply from

wells thereon and their fair market values if the well waters were polluted so as to render them unfit for domestic use. The respondents, at the trial, expressed the opinion that if they had a water supply from Lynden the values of their properties would not be diminished.

■ It appears from the record that appellants will continue to operate their dehydrating plant and make use of the sump. The respondents are not seeking to enjoin the operation of the plant or the use of the sump, but are proceeding on the theory that they have an adequate remedy at law to recover damages in so far as their farms are concerned. The court was of the opinion that the damage to the land should be regarded as permanent, and that, by reason of the destruction of the wells for domestic uses, their respective farms had been depreciated in value. An injury of the kind in question may be permanent in a legal sense, though not coextensive with perpetual, unending or unchangeable. *Union Oil & Mining Co. v. Bowman,* 144 Okla. 54, 289 Pac. 296. A tract of land suitable for agricultural purposes and upon which the owner and his family make their home is of much greater value if the obtainable well water is suitable for domestic uses than if the water is unfit for such purposes.

■ We have not been cited to any case decided by this court discussing the measure of damages where the injury to wells is permanent, nor have we been able to find one after research. The best statement of the applicable rule to the situation here and its exceptions which we have been able to find, and which we now adopt, is in 56 Am. Jur. 841, Waters, § 422, as follows:

"It is the general rule that where the injury caused by the pollution is permanent and irreparable, the measure of damages is the difference in the market value of the property before and after the creation of the nuisance. But if the injury resulting from the pollution is of a temporary character, or if the nuisance is a temporary or abatable one, the measure of damages is the depreciation in the rental value of the property caused by the nuisance."

Nearly all of the adjudicated cases relate to the pollution of streams from which the land owner gets the water supply, but the same principle necessarily applies to wells as a source of supply. In the annotation in 38 A. L. R. 1388, the rule is stated as follows:

"It is the general rule that where an upper riparian owner has caused the pollution of the watercourse to the injury of a lower riparian owner, and the evidence shows that the injury is permanent and irreparable, the measure of damages is the difference in the market value of the property before and after the creation of the nuisance."

In addition to depreciation in the market value of the farms of respondents, the court allowed the reasonable cost and expense of securing a water supply by hauling water between the time of the commencement of the action and the trial. This expense was necessarily incurred and was a natural and probable consequence of the act of appellants in causing the well water to become polluted.

At the trial, the appellants submitted no evidence on the depreciation in the value of the farms to refute respondents' evidence. When it became apparent that the court was going to adopt as the measure of damages the depreciated values, a request was made to reopen the case for the submission of such evidence. The court denied the application. The reopening of a case after it has been submitted to the court for decision is within the discretion of the court, and its action will not be disturbed unless it clearly appears that such discretion has been abused. There is nothing in the record from which we can say that the discretion was abused.

The court enjoined appellants from maintaining the sump in such a manner as to permit the emission of offensive odors that would be carried to the premises of respondents, and directed appellants to abate the nuisance they had created by removing from the sump all potato peelings, cuttings, scrapings, potato pulp, decayed potatoes, refuse and other offal. Rem. Rev. Stat., § 943 [P.P.C. § 81-1], provides that the maintenance of anything offensive to the

senses so as to essentially interfere with comfortable enjoyment constitutes a nuisance and is the subject of an action for damages and other further relief. The findings of the court support the conclusion that appellants created, and have been maintaining, a nuisance. The respondents were entitled to relief by injunction and abatement.

The judgment is affirmed.

SIMPSON, C. J., SCHWELLENBACH, HILL, and DONWORTH, JJ., concur.

[1] Reported in 217 P. (2d) 337.