Lloyd BRANCH and Jeanne Branch, Plaintiffs and Respondents,

v.

WESTERN PETROLEUM, INC., Defendant and Appellant.

No. 17178.

Supreme Court of Utah.

Nov. 8, 1982.

Gayle F. McKeachnie, Clark B. Allred, Vernal, for defendant and appellant.

George E. Mangan, Herbert W. Gillespie, Roosevelt, for plaintiffs and respondents.

STEWART, Justice:

The Branches, the plaintiff property owners, sued for damages for the pollution of their culinary water wells caused by percolation of defendant Western Petroleum Inc.'s formation waters (waste waters from oil wells containing various chemical contaminants) into the subterranean water system that feeds the wells. A jury answered questions to special interrogatories, finding, inter alia, that the formation waters had contaminated plaintiffs' two wells and awarded damages of $8,050 for pollution of the well water, $700 for trespass, $10,000 for "mental suffering, discomfort and annoyance," and $13,000 punitive damages. The jury, over objection, was instructed on the theory of negligence; however, the trial court entered judgment on the basis of strict liability for the above amounts, except that damages for mental suffering, discomfort, and annoyance were disallowed.

Western appeals, arguing that the trial court erred in awarding damages for pollution of the wells on the basis of strict liability. It contends that negligence is the only valid legal theory upon which the judgment can be sustained and that the trial court erred (1) in not instructing on proximate cause; and (2) in not directing the jury to find the percentage of negligence attributable to each party as required by the Utah Comparative Negligence Act, U.C.A., 1953, § 78–27–38. Western also complains of the trial court's failure to reduce damages by the percentage of pollution "caused by other parties or conditions"; an improper selection of the jury venire; and the award of punitive damages without a showing that defendant's actions were willful and malicious. No attack is made on the judgment of $700 for trespass. On a cross-appeal, the Branches contend that the court erred in striking the jury award for mental suffering, discomfort, and annoyance.

I.

In December 1975, Western purchased forty acres of land in a rural area north of Roosevelt, Utah, which had previously been used as a gravel pit. Western used the property solely for the disposal of formation water, a waste water produced by oil wells while drilling for oil. Formation water contains oil, gas and high concentrations of salt and chemicals, making it unfit for culinary or agricultural uses. The formation water was transported by truck from various oil-producing sites and emptied into the disposal pit with the intent that the toxic water would dissipate through evaporation into the air and percolation into the ground. Alternative sites for disposing of the water were available to Western, but at a greater expense.

In 1976, the Branches purchased a parcel of property immediately adjacent to, and at an elevation of approximately 200 to 300 feet lower than, Western's property. The twenty-one acre parcel had on it a "diligence" well, which had been in existence since 1929, some outbuildings, and a home. After acquiring the property, the Branches made some $60,000 worth of improvements to the home and premises. Prior owners of the property used the water from the well for a grade A dairy and later a grade B dairy. Both dairy operations required that the water be approved for fitness and purity by appropriate state agencies. The Branches, as had all prior owners since 1929, used water from the diligence well for culinary purposes. The water from the diligence well was described as being sweet to the taste and of a high quality until December of 1976.

Two months after purchasing the property, the Branches noticed that the well water began to take on a peculiar taste and had the distinctive smell of petroleum products. Soap added to the water would no longer form suds. They observed that polluted water from Western's disposal pit was running onto the surface of the Branches' property and, on one occasion, reached their basement, causing damage to food stored there. After testing the diligence well water and finding it unfit for human consumption, and after their rabbits and one hundred chickens had died, apparently from the polluted water, the Branches began

trucking water to their property from outside sources. In November, 1977, the Branches dug an additional well south of their home. Water from the new well was tested and found safe for culinary purposes. But after a few months, the new well also ceased producing potable water, and on advice of the State Health Department, the Branches ceased using the new well for culinary purposes and hauled water to their property almost until the time of trial.

The Branches requested Western to cease dumping formation water in the disposal pit, but Western refused unless the Branches would post a bond to cover the costs. Western did, however, agree to build a pond on its property to contain the escaping surface water and prevent it from flowing onto the Branches' land. In doing so, Western failed to establish the proper boundary line and built part of the pond on the Branches' land. After the Branches hired a surveyor to establish that Western had built the pond on their land, Western built another containing pond on its own property. The pond, however, was only partially successful in preventing the run-off onto the Branches' land from the disposal pit. Western caused additional damage by permitting its trucks to enter the Branches' property for the purpose of pumping out the containment ponds. When the discharge nozzles on the trucks were left open, polluted water was sprayed directly onto the Branches' land.

As a consequence of the unavailability of culinary water in her home, plaintiff Jeanne Branch returned to her original home in Colorado for a three or four month period so that she could "pull herself together." During this time, Lloyd Branch made weekly trips to and from Colorado to be with his family and otherwise tried to keep in contact with his wife on the telephone while he maintained his contracting business in Roosevelt.

Western's agents admitted that they did not know, and made no attempt to ascertain, what state law was with respect to permitting formation waters to seep or percolate into subsurface waters. Even after Western became aware of the laws relative to dumping, it still took no affirmative action to obtain approval of its ponds.

At trial the major issue was whether and how Western's formation waters caused the pollution of the Branches' wells. Western's expert, Mr. Ferris, a private geologist with approximately two years professional experience in the Rocky Mountain area, and the Branches' expert, Mr. Montgomery, a state geologist who had spent nine years working for the Utah Division of Water Resources, agreed that the subsurface waters consist of shallow groundwater and a deeper aquifer known as the Duchesne Formation. The Duchesne Formation produces the culinary water which is tapped by the Branches' wells. The two experts also agreed that formation water in the disposal pit was percolating into the subsurface waters, but they disagreed on whether the polluted waters had merely entered the shallow groundwaters or had percolated down into the Duchesne Formation.

Ferris maintained that the formation water only entered the shallow groundwater and did not penetrate to the Duchesne Formation. He concluded that the formation water could have entered the Branches' original well only through cracks in the well casing at the level of the shallow groundwaters. He further testified that none of Western's polluted water entered the Branches' new well because there were no cracks in its casing. In addition, Ferris testified that since the shallow groundwaters were naturally contaminated and unfit for human use, Western's additional pollutants were of no consequence to the Branches. The new well, according to Ferris, contained naturally poor, although useable, water from the Duchesne Formation.

Montgomery, testifying for the Branches, admitted that the Duchesne Formation water was of relatively poor quality and contained many natural contaminants. However, he stressed that the natural contaminants were not sufficient to cause the well water to fall below the standards set by the Public Health Service for acceptable human use. He stated that the waters

from Western's disposal water percolated below the shallow groundwater and through natural joints and cracks into the deeper Duchesne Formation, where it entered both of the Branches' wells and made them unfit for human use.

The jury obviously considered Montgomery the more convincing of the two experts. It found, in response to special interrogatories, that "defendant's use of the evaporation pit for the dumping of formation water [was] a cause of the pollution of the water in plaintiffs' [wells]," and that Western caused 66 percent of the pollution in Branches' original well and 52 percent of the pollution in the new well. The rest of the pollution was found to be caused by other unspecified "parties or conditions." The jury also found that Western was "negligent . . . in dumping formation waters in its evaporation pit," and had also committed a "trespass upon plaintiffs' land . . . other than the claimed pollution of [the] wells."

## II.

The major substantive dispute is whether the trial court erred in entering judgment against Western on the basis of strict liability for pollution of the Branches' wells. Western argues that other states have based liability for pollution of subterranean waters on either negligence, nuisance, or trespass, and that since the Branches failed to allege nuisance or trespass, "the only accepted theory upon which this case could be based is negligence."[1] Therefore, according to Western, the trial court erred in entering judgment on the basis of strict liability. Western further submits that since the court did not instruct the jury on proximate cause and comparative negligence, the judgment cannot stand. The Branches, on the other hand, take the position that Western created an abnormally dangerous condition by collecting contaminated water on its land for the purpose of having it seep or percolate into the ground-

water and that, therefore, the law of strict liability controls.

This Court has not heretofore had occasion to consider the legal principles which govern liability for the pollution of subterranean waters by industrial wastes. Our survey of cases from other states and of legal scholars indicates that a variety of legal theories have been relied on. The theories that have been employed include negligence, private nuisance, public nuisance, negligent nuisance, nuisance without negligence, intentional nuisance, absolute nuisance, trespass, and strict liability. Davis, *Groundwater Pollution: Case Law Theories for Relief,* 39 Mo.L.Rev. 117 (1974); Annot., Landowner's Right to Relief Against Pollution of His Water Supply by Industrial or Commercial Waste, 39 A.L. R.3d 910 (1971); Annot., Liability for Pollution of Subterranean Waters, 38 A.L.R.2d 1265 (1954). *See generally Atlas Chemical Industries, Inc. v. Anderson,* Tex.Civ.App., 514 S.W.2d 309 (1974), *aff'd,* 524 S.W.2d 681 (1975). The variety of approaches reflects numerous considerations, such as the general hydrological conditions in the state; the relative significance of promoting industrialization compared with the importance of promoting conservation of water; the nature of the particular state's water law; and, in particular, whether the doctrine of correlative rights applies to the use of water resources. *See* Davis, *Groundwater Pollution, supra,* at 119–37.

In England under the common law, percolating water was considered part of the freehold and subject to private ownership. In American law it is generally recognized that a landowner has no absolute right to pollute percolating waters. Annot., 38 A.L.R.2d at 1267. In this state, a landowner has no such absolute right because percolating waters belong to the people of the state. *J.J.N.P. v. State of Utah,* 655 P.2d 1133, No. 17183, Utah, (filed September 22, 1982). For that rea-

---

1. Defendant relies on the following authorities: *General Crude Oil Co. v. Aiken,* 162 Tex. 104, 344 S.W.2d 668 (1961); *Ross v. Fink,* Okl., 378 P.2d 1011 (1963); *Turner v. Big Lake Oil Co.,* 128 Tex. 155, 96 S.W.2d 221 (1936); *United Fuel Gas Co. v. Sawyers,* Ky., 259 S.W.2d 466 (1953); Annot., 38 A.L.R.2d 1265, 1268 (1954); and Annot., 39 A.L.R.3d 910, 921 (1971).

son, and because percolating waters are migratory and the rights of the landowners to those waters are correlative, § 73–5–1, such waters are subject to the maxim that one may not use his land so as to pollute percolating waters to the injury of another. Annot., 38 A.L.R.2d at 1267.

As Utah is one of the most arid states in the union, the protection of the purity of the water is of critical importance, and the Legislature has enacted laws for the protection of both surface and subterranean waters.[2] U.C.A., 1953, § 26–11–8 (Supp. 1981); § 40–6–5; § 76–10–801; § 76–10–802; § 76–10–803(1)(d). Absent a permit, U.C.A., 1953, § 73–14–5[3] made it

> unlawful for any person to discharge a pollutant into waters of the state or to cause pollution as defined in section 73–14–2(a) which constitutes a menace to public health and welfare, or is harmful to wildlife, fish or acquatic life, or impairs domestic, agricultural, industrial, recreational or other beneficial uses of water, or to place or cause to be placed any wastes in a location where there is probable cause to believe they will cause pollution.

Two doctrines have developed in the common law to provide a remedy to a private landowner for nontrespassory injuries caused by another. The landmark case of *Rylands v. Fletcher,* 3 H. & C. 774, 159 Eng.Rep. 737 (1865), rev'd in *Fletcher v. Rylands,* L.R. 1 Ex. 265 (1866), aff'd in *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868), held that one who uses his land in an unnatural way and thereby creates a dangerous condition or engages in an abnormal activity may be strictly liable for injuries resulting from that condition or activity. Whether a condition or activity is considered abnormal is defined in terms of whether the condition or activity is unduly dangerous or inappropriate to the place where it is maintained. W. Prosser, Law of Torts § 78, at 506 (4th ed. 1971). That doctrine was the genesis of § 519 of the Restatement of Torts (1939), which, however, limited strict liability to "ultrahazardous activities." Prosser, *supra,* at 512.

Although *Rylands v. Fletcher* was initially rejected by a number of states, its influence has been substantial in the United States. According to the latest edition of Dean Prosser's treatise on torts, only seven American jurisdictions have rejected the rule of that case, while some thirty jurisdictions have essentially approved the rule. *Id.* at 509. Indeed, the strict liability rule of the Restatement of Torts was broadened in § 519 of the Restatement (Second) of Torts by making it applicable to "abnormally dangerous activities."

 Nuisance law also protects property interests from nontrespassory invasions.

---

**2.** Section 73–14–1, in effect at the time this case was tried, expressed the policy of the State with regard to pollution:

> Pollution of waters—Public policy of state. Whereas the pollution of the waters of this state constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish and aquatic life, and impairs domestic, agricultural, industrial, recreational and other legitimate beneficial uses of water, and whereas such pollution is contrary to the best interests of the state and its policy for the conservation of the water resources of the state, it is hereby declared to be the public policy of this state to conserve the waters of the state and to protect, maintain and improve the quality thereof for public water supplies, for the propagation of wildlife, fish and aquatic life, and for domestic, agricultural, industrial, recreational and other legitimate beneficial uses; to provide that no waste be discharged into any waters of the state without first being given the degree of treatment necessary to protect the legitimate beneficial uses of such waters; to provide for the prevention, abatement and control of new or existing water pollution; to place first in priority those control measures directed toward elimination of pollution which creates hazards to the public health; to give reasonable consideration to the economic impact of water pollution control on industry including agriculture in the state; and to co-operate with other agencies of the state, agencies of other states and the federal government in carrying out these objectives. Chapter 14 of Title 73 was repealed and replaced by the Utah Water Pollution Control Act, § 26–11–1 et seq. in 1981. Laws of Utah 1981, Ch. 126.

**3.** As stated *supra* note 2, Chapter 14 of Title 73 was replaced by the Water Pollution Control Act, § 26–11–1 et seq. Section 26–11–8 of that act is similar to repealed § 73–14–5.

Unlike most other torts, it is not centrally concerned with the nature of the conduct causing the damage, but with the nature and relative importance of the interests interfered with or invaded. The doctrine of nuisance "has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of action or omission which has lead to the invasion." W. Prosser, *supra,* § 87 at 73–75. Since it is not the nature of one's conduct that generally is essential to an action for nuisance, a person whose interests have been invaded may have a claim for relief based both on nuisance and on the nature of the conduct producing the damage. *See Cities Service Oil Co. v. Merritt,* Okl., 332 P.2d 677, 684 (1958); *Wood v. Picillo,* R.I., 443 A.2d 1244 (1982). As the court in *Wood* stated:

> The essential element of an actionable nuisance is that persons have suffered harm or are threatened with injuries that they ought not have to bear. *Citizens for Preservation of Waterman Lake v. Davis,* R.I., 420 A.2d 53, 59 (1980). Distinguished from negligence liability, liability in nuisance is predicated upon unreasonable injury rather than upon unreasonable conduct. *Braun v. Iannotti,* 54 R.I. 469, 471, 175 A. 656, 657 (1934). Thus, plaintiffs may recover in nuisance despite the otherwise nontortious nature of the conduct which creates the injury.

*Id.* at 1247. *Accord, Vincent v. Salt Lake County,* Utah, 583 P.2d 105 (1978); *Mowrer v. Ashland Oil & Refining Co.,* 518 F.2d 659 (7th Cir.1975).

▮▮ It is of no consequence that a business which causes a nuisance is a lawful business. *Mowrer v. Ashland Oil & Refining Co., supra,* at 661. The production of formation water is a natural and necessary incident to the business of producing oil and gas. A business such as Western, which collects and disposes of formation water, conducts a wholly legitimate business. But that does not give it a license to dispose of waste in a manner that for practical purposes appropriates the property of others by

making it impossible for them to use water which they are entitled to use. *North Point C.I. Co. v. Utah & Salt Lake Canal Co.,* 16 Utah 246, 52 P. 168 (1898).

▮▮ There are two separate, although somewhat related, grounds for holding Western strictly liable for the pollution of the Branches' wells. First, the facts of the case support application of the rule of strict liability because the ponding of the toxic formation water in an area adjacent to the Branches' wells constituted an abnormally dangerous and inappropriate use of the land in light of its proximity to the Branches' property and was unduly dangerous to the Branches' use of their well water. Several cases on comparable facts have applied strict liability due to the abnormal danger of polluting activity. For example, *Mowrer v. Ashland Oil & Refining Co., Inc.,* 518 F.2d 659 (7th Cir.1975), applied strict liability to the leakage of crude oil and salt water into a fresh water well; *Yommer v. McKenzie,* 255 Md. 220, 257 A.2d 138 (1969), applied the same rule to the seepage of gasoline from an underground tank into an adjoining landowner's well; *Cities Service Co. v. Florida,* Fla.App., 312 So.2d 799 (1975), applied strict liability to the escape of phosphate slime into a creek and river. *See also Bumbarger v. Walker,* 193 Pa.Super. 301, 164 A.2d 144 (1960) (strict liability for well pollution caused by defendant's mine blasting). *See generally Clark-Aiken Co. v. Cromwell-Wright Co.,* 367 Mass. 70, 323 N.E.2d 876 (1975) (strict liability applied to escape of impounded water); *Indiana Harbor Belt Railroad Co. v. American Cynamid Co.,* 517 F.Supp. 314 (N.D.Ill.1981) (strict liability applied to spillage of toxic chemical that resulted in property damage and pollution of water supply); W. Prosser, *supra,* § 78 at 512–13 and cases there cited.[4] *See also Atlas Chemical Industries, Inc. v. Anderson,* Tex.Civ.App., 514 S.W.2d 309 (1974), *aff'd* 524 S.W.2d 681 (1975), where the Texas court, distinguishing a case relied upon by Western, *Turner v. Big Lake Oil Co.,* 128 Tex. 155, 96 S.W.2d 221 (1936), held

---

4. For cases applying various theories with differing results see Davis, *Groundwater Pollu-* *tion: Case Law Theories for Relief,* 39 Mo.L. Rev. 117 (1974).

the defendant strictly liable for polluting surface streams with industrial wastes.[5] The strict liability rule of *Rylands v. Fletcher* was held to apply to pollution cases "in which the defendant has set the substance in motion for escape, such as the discharge of the harmful effluent or the emission of a harmful gas or substance."[6] *Atlas Chemical, supra,* at 314.

In concluding that strict liability should govern in that case, the court in *Atlas Chemical* reasoned that the common law rules of tort liability in pollution cases "should be in conformity with the public policy of this state as declared by the Legislature in the Texas Water Code . . . ." *Id.* at 315.[7] The court also found support for the rule of strict liability in the policy consideration that an industry should not be able to use its property in such a way as to inflict injury on the property of its neigh-bors because to do so would result in effect in appropriating the neighbor's property to one's own use. An industrial polluter can and should assume the costs of pollution as a cost of doing business rather than charge the loss to a wholly innocent party. The court in *Atlas Chemical* stated:

> We know of no acceptable rule of jurisprudence which permits those engaged in important and desirable enterprises to injure with impunity those who are engaged in enterprises of lesser economic significance. The costs of injuries resulting from pollution must be internalized by industry as a cost of production and borne by consumers or shareholders, or both, and not by the injured individual.

*Id.* at 316.

We think these reasons adequately support application of the rule of strict liability in this case.

---

**5.** The Texas court was of the opinion that if the escape of the pollution was unintentional then the governing law is negligence, not strict liability. In non-pollution cases, this Court has not required that a nuisance action be based on negligence. *Vincent v. Salt Lake County,* Utah, 583 P.2d 105 (1978); *Sanford v. University of Utah,* 26 Utah 2d 285, 488 P.2d 741 (1971).

**6.** Even if Western did not know that the formation water would enter the aquifer and cause damage to plaintiffs' wells, it could have determined the likelihood of that consequence. As Professor Davis has stated:

> A polluter should not be absolved from liability just because he may not be able to anticipate the movement of the polluted groundwater he created. This defense should not be recognized for several reasons. First, the hydrology of groundwater movement is much better understood now than it was when many of the early groundwater pollution cases were decided. Even though precise mapping of groundwater movement in any particular location is still expensive, it is within the reach of any major waste producer which proposes to inject wastes underground. Disposal wells need porous formations for successful waste injection and the appropriate hydrologic tests would insure a successful injection well. Therefore, persons deliberately disposing of wastes underground ought to be required to act in accordance with the information gained by such testing regarding the movement of the injected wastes and their probable effects on neighboring groundwater uses. If they do not make such tests, they should be charged with the information they would have gained had they made them. Second, it is generally known now that liquids placed on the ground will seep into the soil and may enter the body of groundwater percolating beneath the surface. Persons causing groundwater pollution in ways, other than by deliberate underground disposal, should be charged with such knowledge and should not be insulated from liability for groundwater pollution by claiming that they know nothing more about groundwater movement than was known in 1843 when *Acton v. Blundell* was decided. Although a particular polluter might still legitimately claim he could not predict particular injurious consequences of his activity, he can no longer claim legitimately that the polluting material vanished from the earth once it seeped beneath the surface. He knows it will go somewhere. Such a defense to nuisance liability is not recognized in surface watercourse and air pollution cases. Groundwater pollution cases should not recognize it either.
>
> Pollution of a groundwater aquifer may have pervasive effects both in terms of territorial extent and duration. With reliance on our groundwater supplies increasing, the old court-made rules concerning groundwater pollution are no longer adequate.

Davis, *supra* note 3, at 145–46. *See also Wood v. Picillo,* R.I., 443 A.2d 1244, 1249 (1982).

**7.** The holding of the court in *Atlas Chemical* was limited to uses in which the discharge of pollutants was intentional. In the instant case, the discharge was also intentional.

The judgment of the trial court may also be sustained on the alternative doctrine of nuisance per se. The pollution of underground water has been held a nuisance by a number of courts. *Pollard v. Land West, Inc.,* 96 Idaho 274, 526 P.2d 1110 (1974); *Cities Service Oil Co. v. Merritt,* Okl., 332 P.2d 677 (1958); *Wood v. Picillo,* R.I., 443 A.2d 1244 (1982); *Watson v. Great Lakes Pipeline Co.,* 85 S.D. 310, 182 N.W.2d 314 (1970); *Haveman v. Beulow,* 36 Wash.2d 185, 217 P.2d 313 (1950); *see generally* 39 A.L.R.3d at 922; 38 A.L.R.2d at 1285. When the conditions giving rise to a nuisance are also a violation of a statutory prohibition, those conditions constitute a nuisance per se, and the issue of the reasonableness of the defendant's conduct and the weighing of the relative interests of the plaintiff and defendant is precluded because the Legislature has, in effect, already struck the balance in favor of the innocent party. Defendant's violation of § 73–14–5 (See § 26–11–8 for corresponding current provision) and § 76–10–801 removed the issue of the reasonableness of its conduct compared with the nature of the injury inflicted from consideration in this case. The declaration of the Legislature is conclusive, and its determination will not be second guessed. *Harmison v. City of Lewistown,* 153 Ill. 313, 38 N.E. 628 (1894); *City of Chicago v. Shaynin,* 258 Ill. 69, 101 N.E. 224 (1913); *Eccles v. Ditto,* 23 N.M. 235, 167 P. 726 (1917); W. Prosser, *supra,* § 87 at 582–83. The result for practical purposes is the same as strict liability.

We are aware that a nuisance theory was not presented to the trial court. Usually we will not consider on appeal a theory not presented to the trial court. However, nuisance per se is in reality just another term for strict liability. Furthermore, we may affirm a trial court's decision on proper grounds even though different than those relied upon by the trial court. *Jesperson v. Jesperson,* Utah, 610 P.2d 326 (1980); *Allphin Realty, Inc. v. Sine,* Utah, 595 P.2d 860 (1979).

In sum, the trial court properly ruled that Western was strictly liable for the damage which it caused the Branches. Since liability was properly based on strict liability, the failure of the trial court to give instructions on comparative negligence and proximate cause was not error. Contributory negligence is neither a defense to a nuisance action, *Mowrer v. Ashland Oil & Refining Co. Inc.,* 518 F.2d 659 (1975), nor to an action based on strict liability. The issue of actual causation was decided in favor of the Branches, and there was no issue of proximate causation to be decided.

We have already noted that the jury in this case was instructed, over the Branches objection, on a theory of negligence and that the jury's findings did not cover all the issues under a negligence theory. Nevertheless, the findings were sufficient as to all the factual issues under the law of nuisance per se and strict liability.

III.

Western also contends that the trial court should have reduced the damages awarded for the pollution of the wells by the percentage of pollution found by the jury to have been caused by other parties or conditions.

It is conceded by the Branches that the water in the area contains a high level of natural contaminants, although not so high as to make the water unsafe or unpotable. Federal health standards established 500 parts of solids per million as the highest safe level for the water. Based on the latest chemical tests that were conducted, the Branches' diligence well contained 980 parts of solids per million and the new well 920 parts of solids per million. The jury found that Western was responsible for 66 per cent of the solids in the diligence well and 52 per cent of the solids in the second well.

The amount of contaminants in the diligence well attributable to Western, therefore, was 646.8 parts per million, leaving approximately 333 parts per million attributable to either natural or other causes. As for the new well, Western was responsible for 478.4 parts per million of the contami-

nants, and the remaining 441 parts were attributable to either natural or other causes. Thus, without the pollution caused by Western, the level of contaminants in both wells would have been within the limits of the federal safety standards. In other words, but for Western's pollution, the wells would have been useable.

Contrary to the implication of Western's argument, the injury to the Branches was not the total amount of contaminants in each well; it was rather the amount of contaminants above the safe level of 500 parts per million. The contamination above that level caused the whole injury, and as to that, Western was legally responsible.

## IV.

■ Western also contends that the trial was defective on the ground that the jury venire was improperly chosen because those who wanted to go elk hunting were excused. Section 78–46–16(1) requires that a challenge to jury selection be made "[w]ithin seven days after the moving party discovered, or by the exercise of diligence could have discovered the grounds therefore, and in any event before the trial jury is sworn to try the case . . . ."

Western contends that it was not aware of the improper action prior to the time the jury was sworn and therefore was unable to file a motion challenging the selection of the jury within the statutory time period. Upon learning of the removal of those prospective jurors who desired to go elk hunting, Western filed with the trial court a motion requesting a new trial or a hearing to determine whether the jury selection was proper. The motion was denied, and no hearing was held.

Western's objection is not well taken. There are no affidavits indicating how many prospective jurors were excused or why Western did not find out about the facts sooner. We think the defect should have been discovered in the exercise of due diligence before the commencement of the trial as required by the statute.

Even assuming that the challenge was timely raised, § 78–46–16(2) requires a "substantial failure to comply with this act" and a showing that an "actual and substantial injustice and prejudice has resulted or will result to a party in consequence of the failure" to comply. Applying this latter requirement, Western's contention of prejudicial error fails. The jury panel was comprised of four males and four females. It consisted of a superintendent of schools, a highway patrolman, a former deputy sheriff (currently a Department of Transportation employee), a farmer-rancher, a county recorder, a high school secretary, and two housewives. There is nothing in the record to suggest that the prospective jurors who were excused were drawn from any particular religious, cultural, racial, sexual, or socio-economic class. Nor is there anything to suggest that the excluded group represented a belief or conviction, not otherwise represented on the panel, which was more sympathetic to the interests of Western. Since there is no reason to suppose the elimination of a few elk hunters from the panel skewed the composition of the jury panel in any manner, and since the jury was passed for cause, there is no basis for finding prejudicial error.

## V.

■ Western's final contention on its appeal challenges the award of punitive damages. It argues that punitive damages are appropriate only when willful and malicious conduct is shown and that the court erred in including the phrase "reckless indifference and disregard" in its instruction on punitive damages. However, in *Terry v. Zions Cooperative Mercantile Institution,* Utah, 605 P.2d 314 (1979), this Court held that punitive damages may be awarded when one acts with reckless indifference and disregard of the law and his fellow citizens:

This presumed malice or malice in law does not consist of personal hate or ill will of one person towards another but rather refers to that state of mind which is reckless of law and of the legal rights of the citizens in a person's conduct toward that citizen. . . . In such cases malice in

law will be implied from unjustifiable conduct which causes the injury complained of or from a wrongful act intentionally done without cause or excuse. *Id.* at 327. *See also First Security Bank v. J.B.J. Feedyards,* 653 P.2d 591 (1982).

▪▪ The evidence in this case meets that standard. Western discharged the waste water into the disposal pit intending that it seep into and percolate through the soil. Thus, the pollution of the percolating waters was willful and carried out in disregard of the rights of the Branches. Moreover, Western compounded the Branches' problems by its trespass on their land, the spraying of waste water over their land and the failure to comply with state law. In addition, Western continued its dumping activities even after the pollution of the diligence well. The punitive damage award was adequately supported by evidence of reckless indifference toward, and disregard of, the Branches' rights.

Furthermore, there is no merit to Western's contention that the award of punitive damages was excessive and influenced by passion or prejudice rather than reason. The jury was properly instructed that the purpose of exemplary damages is to deter defendant and others from engaging in similar conduct. In *Terry v. Zion's Cooperative Mercantile Institution, supra,* this Court stated:

> The purpose of a punitive or exemplary damage award is not to compensate the party harmed but rather to punish the wrongdoer, to deter him from similar acts in the future, and to provide fair warning to others similarly situated that such conduct is not tolerated.

> Due to the purposes underlying the award of punitive damages many factors contribute in determining their appropriate measure. . . . The jury in its original decision or the court in its review of that decision must also consider the particular nature of the defendant's acts, the probability of those acts being repeated in the future, and the relative wealth of the particular defendant.

605 P.2d at 328. *See also Nash v. Craigco, Inc.,* Utah, 585 P.2d 775, 778 (1978). The award of punitive damages is a matter in the first instance for the discretion of the jury, and the award was not excessive in relation to actual damages in either our view or the view of the trial judge whose judgment we accord considerable weight because of his first hand knowledge of the evidence in the case.

## VI.

▪▪ The jury returned a verdict in favor of the Branches for mental suffering, discomfort and annoyance in the amount of $10,000. During the trial, the court dismissed the claim for such damages on the ground that "emotional distress and anxiety and upset concerning the matter is not compensible, per se. It may be in connection with exemplary, punitive damages. I don't know. But per se, there isn't a separate cause of action for that. And I grant your motion." Notwithstanding that ruling, the trial judge reconsidered, and at the conclusion of the trial, submitted a special interrogatory on the amount of damage suffered by the Branches as a result of "emotional distress, discomfort and annoyance." In response to that interrogatory, the jury found damages in the amount of $10,000. The trial judge initially entered judgment for that amount, but then struck that part of the judgment apparently on the ground that such damages could be recoverable, if at all, only under the doctrine of *Samms v. Eccles,* 11 Utah 2d 289, 358 P.2d 344 (1961). *Samms* dealt with the independent tort of intentional infliction of emotional distress, not with a nuisance case, and is therefore clearly inapplicable to this case.

It has, however, long been recognized that "a plaintiff may recover damages for personal inconvenience, annoyance and discomfort caused by the existence. of a nuisance." *Wade v. Fuller,* 12 Utah 2d 299, 302, 365 P.2d 802, 805 (1961). *See also Pollard v. Land West Inc.,* 96 Idaho 274, 526 P.2d 1110 (1974); *Edwards v. Talent Irrigation District,* 280 Or. 307, 570 P.2d 1169 (1977); 58 Am.Jur.2d *Nuisances* § 124 and § 125 (1971) (citing cases awarding damages for mental distress).

Admittedly, damages for inconvenience, annoyance, discomfort and mental distress are not capable of precise calculation, although those elements may reflect direct, immediate, and real injury. In this case the jury had evidence before it to justify the award of substantial damages of the type under consideration. The Branches testified to the emotional distress caused Jeanne Branch which culminated in her leaving her husband for a period of three or four months. In addition to that, the Branches were forced to truck water onto their property and to take numerous other steps to counter the nuisance created by Western.

For the foregoing reasons, we affirm the judgment of the trial court in all respects except with respect to the striking of the award of damages for mental distress, annoyance, and discomfort and remand for the re-entry of that award in the amount specified by the jury.

HALL, C.J., and OAKS and HOWE, JJ., concur.

DURHAM, J., does not participate herein.